## THE SCHOONER EXCHANGE
### *v.*
## M'FADDON & OTHERS.

---

*Present....All the judges.*

A public vessel of war of a foreign sovereign at peace with the United States, coming into our ports, and demeaning herself in a.

THIS being a cause in which the sovereign right claimed by NAPOLEON, the reigning emperor of the French, and the political relations between the United States and France, were involved, it was, upon the suggestion of the Attorney General, ordered to a hearing in preference to other causes which stood before it on the docket.

It was an appeal from the sentence of the Circuit Court of the United States, for the district of Pennsylvania, which reversed the sentence of the District Court, and ordered the vessel to be restored to the libellants.

The case was this—on the 24th of August, 1811, *John M'Faddon & William Greetham*, of the State of Maryland, filed their libel in the District Court of the United States, for the District of Pennsylvania, against the *Schooner Exchange*, setting forth that they were her sole owners, on the 27th of October, 1809, when she sailed from Baltimore, bound to St. Sebastians, in Spain. That while lawfully and peaceably pursuing her voyage, she was on the 30th of December, 1810, violently and forcibly taken by certain persons, acting under the decrees and orders of NAPOLEON, *Emperor of the French*, out of the custody of the libellants, and of their captain and agent, and was disposed of by those persons, or some of them, in violation of the rights of the libellants, and of the law of nations in that behalf. That she had been brought into the port of Philadelphia, and was then in the jurisdiction of that court, in possession of a certain *Dennis M. Begon*, her reputed captain or master. That no sentence or decree of condemnation had been pronounced against her, by any court of competent jurisdiction; but that the property of the libellants in her, remained unchanged and in full force. They therefore prayed the usual process of the court, to attach the vessel, and that she might be restored to them.

Upon this libel the usual process was issued, returnable on the 30th of August, 1811, which was executed and returned accordingly, but no person appeared to claim the vessel in opposition to the libellants. On the 6th of September, the usual proclamation was made for all persons to appear and show cause why the vessel should not be restored to her former owners, but no person appeared.

On the 13th of September, a like proclamation was made, but no appearance was entered.

On the 20th of September, *Mr. Dallas,* the Attorney

SCHOONER
EX-
CHANGE
*v.*
M'FADDON
& OTHERS.

friendly manner, is exempt from the jurisdiction of the country.

SCHOONER of the United States, for the District of Pennsylvania,
EX-     appeared, and (at the instance of the executive depart-
CHANGE  ment of the government of the United States, as it is un-
v.      derstood,) filed a *suggestion*, to the following effect:
M'FADDON
& OTHERS.   Protesting that he does not know, and does not admit
——————  the truth of the allegations contained in the libel, he
        suggests and gives the court to understand and be in-
        formed,

That in as much as there exists between the United
States of America and Napoleon, emperor of France and
king of Italy, &c. &c. a state of peace and amity; the pub-
lic vessels of his said Imperial and Royal Majesty, con-
forming to the law of nations, and laws of the said United
States, may freely enter the ports and harbors of the
said United States, and at pleasure depart therefrom
without seizure, arrest, detention or molestation. That
a certain public vessel described, and known as the *Ba-
laou,* or vessel, No. 5, belonging to his said Imperial
and Royal Majesty, and actually employed in his ser-
vice, under the command of the *Sieur Begon,* upon a
voyage from Europe to the Indies, having encountered
great stress of weather upon the high seas, was compel-
led to enter the port of Philadelphia, for refreshment
and repairs, about the 22d of July, 1811. That having
entered the said port from necessity, and not volun-
tarily; having procured the requisite refreshments
and repairs, and having conformed in all things to
the law of nations and the laws of the United States,
was about to depart from the said port of Philadel-
phia, and to resume her voyage in the service of his
said Imperial and Royal Majesty, when on the 24th
of August, 1811, she was seized, arrested, and de-
tained in pursuance of the process of attachment is-
sued upon the prayer of the libellants. That the said
public vessel had not, at any time, been violently and
forcibly taken or captured from the libellants, their cap-
tain and agent on the high seas, as prize of war, or
otherwise; but that if the said public vessel, belonging
to his said Imperial and Royal Majesty as aforesaid,
ever was a vessel navigating under the flag of the Uni-
ted States, and possessed by the libellants, citizens
thereof, as in their libel is alleged, (which nevertheless,

the said Attorney does not admit) the property of the vessel libellants, in the said vessel was seized and divested, and the same became vested in his Imperial and Royal Majesty, within a port of his empire, or of a country occupied by his arms, out of the jurisdiction of the United States, and of any particular state of the United States, according to the decrees and laws of France, in such case provided. And the said Attorney submitting, whether, in consideration of the premises, the court will take cognizance of the cause, respectfully prays that the court will be pleased to order and decree, that the process of attachment, heretofore issued, be quashed; that the libel be dismissed with costs; and that the said public vessel, her tackle, &c. belonging to his said Imperial and Royal Majesty, be released, &c. And the said Attorney brings here into court, the original *commission* of the said *Sieur Begon*, &c.

*(margin)* THE SCHOONER EXCHANGE v. M'FADDON & OTHERS.

On the 27th of September, 1811, the libellants filed their answer to the suggestion of the District Attorney, to which they except, because it does not appear to be made for, or on behalf, or at the instance of the United States, or any other body politic or person.

They aver, that the schooner is not a public vessel, belonging to his Imperial and Royal Majesty, but is the private property of the libellants. They deny that she was compelled by stress of weather, to enter the port of Philadelphia, or that she came otherwise than voluntarily; and that the property of the libellants in the vessel never was divested, or vested in his Imperial and Royal Majesty, within a port of his empire, or of a country occupied by his arms.

The District Attorney, produced the affidavits of the *Sieur Begon*, and the French consul, verifying the commission of the captain, and stating the fact, that the public vessels of the Emperor of France never carry with them any other document or evidence that they belong to him, than his flag, the commission, and the possession of his officers.

In the commission it was stated, that the vessel was *armed at Bayonne*.

On the 4th of October, 1811, the District Judge dis-

SCHOONER missed the libel with costs, upon the ground, that a pub-
EX- lic armed vessel of a foreign sovereign, in amity with
CHANGE; our government, is not subject to the ordinary judicial
v. tribunals of the country, so far as regards the question
M'FADDON of title, by which such sovereign claims to hold the
& OTHERS. vessel.

From this sentence, the libellants appealed to the
Circuit Court, where it was reversed, on the 28th of
October, 1811.

From this sentence of reversal, the District Attorney,
appealed to this Court.

DALLAS, *Attorney of the United States, for the district of
Pennsylvania*, contended,

1. That this is not a case of admiralty and maritime
jurisdiction.

2. That the public character of the vessel is suffi-
ciently proved; and

3. That being a public national vessel of France, she
is not liable to the ordinary judicial process of this
country.

1. It ought to appear upon the proceedings themselves
that this is a case of admiralty and maritime jurisdic-
tion.

In England the jurisdiction of the Court of admiralty
comprehends three branches. 1. The *criminal* juris-
diction, for the punishment of offences committed upon
the high seas, or submitted to its cognizance by the
statute *law*.

2. The *prize* jurisdiction, as to captures as prize of
war, on the high seas. 3. The Instance Court, which
has jurisdiction of *torts* committed at sea, in which case
locality is essential; and of *maritime contracts*, which
are also perhaps local.

The district Courts of the United States, have the
same three branches of jurisdiction, but the jurisdiction

must be shewn in the proceedings, together with the authority to seize within our waters. *Laws United States,* Vol. 1. p. 53, sect. 2, 11. Vol. 3. p. 91. sect. 6. 3. *Dall.* 6.

But the libel does not bring the case within either of those branches of jurisdiction. The libel simply states that while she was lawfully and peaceably pursuing her voyage, she was forcibly seized under the decrees of Napoleon, emperor of the French. It does not allege any crime upon the high seas. It does not state the seizure to be as *prize of war.* It does not allege a tort committed upon the high seas, nor any maritime contract. The admiralty has no jurisdiction upon the mere possession of the vessel in our harbors, unconnected with a *tort on the high seas.* Nor upon a tort committed here, or in a foreign country—nor upon a mere question of title. 2. *Browne, civ. and ad. law* 110, 111, 113, 114, 115, 116, 117.

There is not a single instance of admiralty jurisdiction exercised in this country without *possession,* coupled with a maritime tort.

2. As to the proof of the public character of the vessel. The flag, the public commission, and the possession of the officer, have always been sufficient evidence, at sea or in port—and for fiscal or executive purposes. Why should it not be sufficient evidence in a judicial proceeding? No public vessel ever carries any other documents. No other proof of property in the sovereign is ever required. It is acknowledged in all our treaties. Even the common law requires only the best evidence which the nature of the case admits.

In the case of *Mr. Pichon,* 4. *Dall.* 321. no other evidence of his public character was produced or required, than a letter from Talleyrand, the French minister for foreign affairs. Upon that evidence he was discharged.

HARPER, *for the Appellees.*

Admitted that the commission, the flag, and the possession, were sufficient evidence of the public character of the vessel

SCHOONER   DALLAS—The principal question then is, whether a
EX-   public national vessel of France, coming into the United
CHANGE   States to repair, is liable to be arrested upon the claim
v.   of title by an individual?

M'FADDON

&OTHERS.   This vessel was seized by a sovereign, in virtue of
———————his sovereign prerogative. In such a case, the claim
of the individual merges in the right of the offended
sovereign. The size of the vessel can make no differ-
ence. Upon principle, the Royal George, belonging to
his Britannic majesty is as liable to this process, as the
*Balaou* No. 5. Suppose a British frigate lying at New
York, and one of her seaman should escape and libel
her for his wages—the same argument which will sup-
port this case would support that.

This was one of the seizures under the Rambouillet
decree. We do not justify that decree, but we say that
whenever the act is done by a sovereign in his sove-
reign character, it becomes a matter of negotiation, or
of reprisals, or of war, according to its importance.

It is proved that she arrived in distress—that she had
been sent on a distant mission with a military cargo.
No assent to submit to the ordinary jurisdiction of the
country, can be presumed in such a case as that. She
had committed no offence while here. She did not come
to trade. There was no implied waver of the peculiar
immunities of a public vessel. The right of free pas-
sage was open to her, as it was to the public vessels of
every other nation, except England, whose ships were
expressly excluded by a particular statute.

But put the question *generally*, can a vessel of war,
for any cause, be attached at the suit of an individual.
In doubtful cases the argument *ab inconvenienti*, ought
to have great weight. The jurisdiction now claimed
would extend to *all men*, to *all suits*, to torts and to con-
tracts; to every vessel seized in a foreign port and ta-
ken into the public service. Impressed seamen might
libel a whole British squadron for their wages. The
peace of our ports and harbors would be at the mercy
of the individuals. It would be impossible to carry it
into practice. The sentence of the Court could not be
executed. It is beautiful in theory to exclaim "*fiat*

*Justitia—ruat cœlum,* but justice is to be administered with a due regard to the law of nations, and to the rights of other sovereigns. When an individual receives an injury from a foreign sovereign, he must complain to his own government, who will make it a matter of negotiation, and if justice be refused may grant reprisals.

Our acts of Congress never subject foreign public vessels to forfeiture. The *non-intercourse* act (as it is called) forfeits private, but not public British vessels—the public vessels are forbidden to come, if they do come, you order them to depart. If they refuse and you are not strong enough to drive them away, you prohibit supplies to them; but you do not subject them to forfeiture.

We do not, however, deny the right of a nation to change the public law as to foreign nations, upon giving notice. We may forbid the entrance of their public ships, and punish the breach of this prohibition by forfeiture; nor do we deny the obligation of a foreign sovereign to conform to pre-existing laws, as to offences—and as to the acquisition of property; nor his liability for his *private* debts and contracts. *Vattel,* 426. *B.* 2. *c.* 18. *sect.* 340. 344. 346. So if a sovereign descend from the throne and become a merchant, he submits to the laws of the country. If he contract private debts, his private funds are liable. So if he charter a vessel, the cargo is liable for the freight.

But in the present case he appears in his sovereign character; the commander of the national vessel exercises a part of his sovereign power; and in such a case no consent to submit to the ordinary judicial tribunals of the country can be implied. Such implied consent must depend on the *act,* on the *person,* and on the *subject.*

Such consent is implied where the municipal law, previously provides and changes the law of nations—where it regulates trade—where it defines and punishes crimes, and where it fixes the tenure of property real or personal. But it cannot be implied where the law of nations is unchanged—nor where the implication is destructive of the independence, the equality, and dignity of the sovereign. Such a jurisdiction is not given by the constitution of the United States, nor

SCHOONER
EX-
CHANGE
*v.*
M'FADDON
& OTHERS.

SCHOONER is it mentioned in the judiciary acts. If so, important
EX-      a jurisdiction was intended to be given, it would cer-
CHANGE  tainly have been mentioned and regulated by law. It
*v.*       cannot be derived from any practical construction of
M'FADDON our laws. In 1794, the public vessels were not seized,
&OTHERS. but ordered away. The impost law, (*Laws of U. S.*
————   *Vol.* 4. *p.* 331, *sect.* 31) excepts public vessels, from
the obligation to make report and entry. The act of
*March* 3d, 1805, (*Vol.* 7. *p.* 334, *sect.* 4) for the pre-
servation of peace in our ports and harbors, gives au-
thority to the president to prohibit the foreign armed
vessels from entering our ports, and to order those to
depart which may have entered, and if they refuse to
depart, to prohibit all intercourse with them, and to
drive them away; but not to seize them. Public ves-
sels were excepted from the *embargo,* in 1807 and 1808.
(*Laws U. S. Vol.* 9. *p.* 7, *sect.* 2. *and p.* 243. *sect.*
1, 2, *and* 3.)

The judicial construction of the law by the courts in
Pennsylvania, was, that a state could not be subjected
to judicial process, unless by the words of the Constitu-
tion of the United States: and many sound minds were
of opinion that even those did not give the jurisdiction;
and when it was finally decided in the Supreme Court
of the United States that a suit might be maintained
against a state in the Federal Courts, the states amend-
ed the constitution so as not to admit of that construc-
tion.

The case of *Nathan v. the Commonwealth of Virginia,*
*1 Dall.* 77, was a foreign attachment against some mili-
tary stores belonging to the state of Virginia: the ob-
ject of which was to compel an appearance; and the
court refused to compel the sheriff to return the writ;
being of opinion that Virginia being a sovereign state
could not be compelled to appear in a court in Pennsyl-
vania. The present process against the vessel is to
compel an appearance. It is true the master may give
security; but to compel him to do so is to bring the
emperor into court, and to subject him, in his sovereign
character, to the jurisdiction of the courts of the United
States.

The *Cassius,* (in the case of *United States v. Judge*

*Peters,* 3 *Dall.* 121, and *Ketland, qui tam* v. *the Cassius,* 2 *Dall.* 365) had violated a municipal law of the United States; yet, being a public vessel of France, the government of the United States directed the attorney general to file a suggestion, stating the character of the vessel, which it was supposed would have taken the case out of the jurisdiction of the court. But the case went off upon another objection to the jurisdiction.

There is then no municipal law, nor any practical construction by the executive, the legislative, or the judicial department of our government, which authorizes the jurisdiction now claimed; we can only have recourse to the law of nations to try the validity of that claim. That law requires the consent of the sovereign, either express or implied, before he can be subjected to a foreign jurisdiction, 2 *Rutherford,* 163 to 170. There is no express assent of a foreign sovereign to the jurisdiction over his prerogative. The distinction is between his private acts, and his acts as sovereign, and between his private and his public property. *Vat. B.* 2, *p.* 343, *ch.* 14. § 213, 216. 2 *Ruth.* 536. *Vat.* 707, *B.* 4. *c.* 7, §. 108, *Martyn* 181. *Ruth.* 54. *Galliani B.* 1, *c.* 5.

The cases of implied assent are, 1. *Trade,* when his goods are liable for freight, or liable to his factor for advances, &c. or liable to pay duties. In all which cases there is a specific lien on the goods. 2. In case he acquire property in the country, whether real or personal. 3. In case of offences against existing laws, such as entering when prohibited, or breaking the peace when in port. But the law of nations excludes the implication and presumption in every case where the sovereignty is concerned—as 1. In the case of an ambassador—2. Of the sovereign himself—3. The passing of his armies through the country, in which case he retains all his rights of sovereignty and jurisdiction over his army—4. In case of his navy passing through our waters.

The British government, although it authorizes the search of private ships for their seamen, disclaims the right to search ships of war, even on the ocean, the place of common jurisdiction.

*Bynkershoek, p.* 39, *c.* 4. for the first time asserts a

SCHOONER principle not recognized by any prior writer: viz. that
EX-   the goods of the sovereign, however acquired, whether
CHANGE of a public or private nature, are liable to process to
*v.*   compel an appearance. But he does not cite one ad-
M'FADDON judged case, nor one writer upon the law of nations to
&OTHERS. support him. The only case he cites is from *Huber*,
————— and that denies the jurisdiction. The *exima* which he
cites is only a kind of chronicle or journal, like the an-
nual register.

It is a book of no authority. The case of the queen
of Spain's ship arrested at Flushing, and the queen of
Bohemia's in 1654, which were released by the states
general, are against him. His book clearly shows that
the practice of nations is against his doctrine. It is
evident that he alludes to a practice of citation in the
states of Holland, or among the members of the Ger-
manic body.

The general principle is against him. He is opposed
by other writers and supported by none. He is op-
posed by the practice of nations and supported by no
judicial decision.

If the courts of the United States should exercise
such a jurisdiction it will amount to a judicial declara-
tion of war. There is already a case before this court
in which it will be called upon to decide whether St.
Domingo be an independant nation; and another in
which it is to determine whether the crown of Spain
belongs to Ferdinand the 7th or Joseph Bonaparte.
If this court is to exercise jurisdiction upon subjects of
this nature, it will absorb all the functions of govern-
ment, and leave nothing for the legislative or executive
departments to perform.

HARE, *contra.*

The position which we are to meet, is understood to
be this, That the possession of property by a foreign
sovereign, without the limits of his jurisdiction, and
within the limits of the United States, precludes all en-
quiry into the title of the thing within his possession.

This principle, we say, is unfounded. The general
rule is that all sovereignty is strictly local, and cannot

be exercised beyond the territorial limits.  This flows SCHOONER
from the nature of sovereignty, which being *supreme*   EX-
power, cannot exist where it is not supreme. 4 *Cranch*,  CHANGE
279, *Rose v. Himely*. There is no instance of its actual   *v.*
extra-territorial operation, except where by fiction of M'FADDON
law it is supposed to be territorial; or at most where &OTHERS,
it exclusively operates upon its own subjects.  The ———
household of an ambassador is supposed to be within
the territorial jurisdiction of his sovereign. *Vattel* 448,
*Martyn* 228, 230.

In other respects the rights of an ambassador are
his own rights founded in considerations appertaining
exclusively to the ambassadorial character.  In the
vessels belonging either to his nation or to himself, he
may exercise, on the high seas, a limited jurisdiction.
The same principle operates here.  The ship is consi-
dered as part of his territory.  But in this case his ju-
risdiction extends over his own subjects only.  His
armies abroad are also subject to his jurisdiction, but
this is the result of positive compact, without which
they cannot go abroad.

The general principle then being in our favor, our
adversaries must show the exception.

Whatever is within the extent of a country, is within
the authority of its sovereign; and if any dispute arises
concerning the effects within the country or passing
through it, it must be decided by the judge of the place.
*Vat.* 446.

Unless the case now before the court be an exception,
this rule is universal.  It grows out of the first princi-
ples of government, which in giving security assumes
jurisdiction.

The general authority over the property of foreign-
ers is as absolute as over the property of subjects.

The arguments in favor of the exception are drawn
rather from inconvenience than from principle, but can-
not be supported upon either ground.

As it regards the private property of the sovereign,

SCHOONER why not assume jurisdiction? Because it is said, it
EX-       would violate his dignity, inasmuch as it is to be pre-
CHANGE    sumed that he will never do wrong. Such a presump-
*v.*      tion, contrary to the fact, may be calculated to give
M'FADDON  him weight at home, but can be of no use abroad. It
& OTHERS. is not universally adopted even at home. The king of
————————  England may be sued by *monstrans de droit.* States
          may prescribe the mode in which they shall be sued.
          This is a matter of internal regulation. Will you then
          respect a foreign sovereign more than his own subjects
          are bound to respect him?

If the sovereign of any free country should unlawful-
ly seize the goods of one of his subjects, he would be
liable in his private capacity like any other person. As
regards the public property of a foreign sovereign, why
should there be any distinction, where the only object
of the suit is merely to ascertain the right.

His public service may suffer, but will you respect
that service at the expence of the rights of your own
citizens?

But it is said, if you arrest this vessel you may ar-
rest a fleet. This is true—and when a foreign fleet
shall have been created by the plunder of our own citi-
zens, let it be arrested.

But the danger of such a case is remote and improba-
ble. The libel must be supported by oath and probable
cause. A judge would not hastily direct process against
a fleet.

But consider the inconveniencies on the other side.
Your own citizens plundered. Your national rights
violated. Your courts deaf to the complaints of the in-
jured. Your government not redressing their wrongs,
but giving a sanction to their spoliators.

The argument of our opponents allows no remedy to
the citizen although dispossessed of his property within
the limits of our own territory. Although the ship
should have been seized in the Delaware, and converted
into a public armed vessel, we are supposed to have no
redress. It does not appear upon the face of the pre-
sent proceedings, that this was not the case.

The argument of inconvenience is equally applicable
to cases in which our own laws authorize process to
issue. Thus, under the act of *June 5th*, 1794, § 3, *Vol.*
3. *p.* 89, if any ship shall be armed in any of the waters
of the United States, with intent to be employed in the
service of any foreign state to cruize against the sub-
jects of another foreign state with whom the United
States are at peace, such ship shall be forfeited. So
also in case a foreign armed ship should be found smug-
gling. In cases of *tort* then, there is a remedy against
the public armed ship of a foreign sovereign. It is
obvious also that there must be such remedy in cases of
*contract*. As in the case of material men for repairs—
Bottomry and mortgage—wreck and pledges. If he
may pledge, the pledge may be proceeded against. If
then there are cases both of *tort* and contract in which
there is a remedy, why not in this?

It is in vain to urge against the *right* of proceeding,
the inconveniences that may result from the *mode*.

On principle, then, there is no foundation for the ex-
ception. Nor is it warranted by authority.

*Vattel, B.* 2, § 83, says " Many sovereigns have
" *fiefs*, and other properties, in the lands of another
" prince : they therefore possess them in the manner of
" other *individuals.*" Thus the kings of England did
homage for the lands they held in France.

*Martins (p.* 85, 182, *Book* 5, *sect.* 9) says that the
supreme police extends over the property of a sove-
reign.

The cases of *Glass v. Sloop Betsy*, 3 *Dall.* 6—*Rose v.
Himely* and *Hudson v. Guestier*, 4 *Cranch* 279. The
*Cosmopolite*, 3 *Rob.* 269, and the authority of *Azuni*
245, 246, affirm the right, in certain cases, of examin-
ing the legality of the prizes of foreign sovereigns.

Prizes are made for account of the sovereign. In
England they are distributed according to the prize
act; but if made by a non-commissioned vessel, they
are *droits* of the admiralty.

SCHOONER
EX-
CHANGE
v.
M'FADDON
& OTHERS.

The possession of the captors is the possession of the sovereign. In these cases therefore the right of the sovereign to the thing in his possession is subjected to judicial investigation.

*Bynkershoek upon Ambassadors,* 40 to 46, expressly states that the property of the sovereign, public and private, is subject to the authority of the judge of the place. *2 Rutherford* 476, 382. The case of the Swed-ish convoy is also an authority to the same effect.

The Constitution of the *United States, Art.* 3, sect. 2, expressly gives the courts of the United States jurisdic-tion in cases between citizens and *foreign states.*

The cases cited on the other side refer only to suits brought directly against a sovereign, or to compel his appearance. But such cases are wholly inapplicable, because not brought in consequence of your jurisdiction over *the thing* within your territory, but to create a jurisdiction over the person which is without it.

In Massachusetts suits between foreigners by process of attachment, cannot be sustained; but the right to the thing in dispute, whether between foreigners or others, will be ascertained there.

You cannot draw to your jurisdiction those who owe you neither a local nor an absolute allegiance; but you may enquire into the validity of every claim to a thing within your jurisdiction.

This doctrine is peculiarly applicable to sovereigns:—

In the case of *Olmstead v. Rittenhouse's executors, (5 Cranch* 115, under the name of *United States v. Judge Peters )* the state of Pennsylvania contended that the District Court had not jurisdiction, because she, as a sovereign state, claimed the money in the hands of the executors, and was really the party interested; but this court decided that, as the state was not ostensibly a party, and as *the thing* was within the jurisdiction of the Court, the District Court should proceed to enforce its sentence.; thereby clearly marking the distinction between a suit against a sovereign, and a process against *a thing* claimed by a sovereign.

HARPER, *on the same side.*

Two questions are raised in this case.

1. Whether this be a case of admiralty jurisdiction, and

2. Whether a judicial remedy can be given for a wrong done by a foreign sovereign.

1. The libel states the seizure to have been made "during the voyage"—and the answer to the claim denies that she was seized in port—it follows therefore that she must have been seized upon the high seas.

2. As to the general power to interfere in case of an illegal seizure made by a foreign sovereign.

Sovereignty is absolute and universal. This is the general rule. But it is contended that there is an exception in four cases.

1. As to the person of a foreign sovereign.

2. As to his ambassadors.

3. As to his armies; and

4. As to his property—which last is said to be an inference from the three former cases. But the three former cases are all founded upon consent, and the latter is not; consequently there can be no analogy between them. Besides, these cases are not exceptions to the sovereignty, but merely exemptions from the ordinary judicial process, by consent of the sovereign. If a foreign sovereign comes secretly into the country, he is not protected from ordinary process; but when he comes openly in his character as a sovereign, an assent is implied, and he comes with all the immunities incident to his dignity, according to the common understanding of the word. All the cases supposed to be against us are founded upon consent. *Bynkershoek* also places it upon the ground of consent, and he is supported by *Barbeyrac* and *Galliani.*

*(margin)* SCHOONER EX-CHANGE *v.* M'FADDON & OTHERS.

SCHOONER
EX-
CHANGE
*v.*
M'FADDON
&OTHERS.
————

The positive authorities against the exemption of the property of the sovereign from the ordinary judicial process, are *Bynkershoek* 25, *Martins* 182, and 2 *Rutherford* 476. The Constitution of the United States takes for granted the suability of the states, and merely provides the means of carrying the principle into effect. The exemption of the sovereign himself, his ambassador and his armies, depends upon particular reasons which do not apply to his property, nor to his ships of war.

PINKNEY, *Attorney General, in reply.*

When wrongs are inflicted by one nation upon another, in tempestuous times, they cannot be redressed by the judicial department. Its power cannot extend beyond the territorial jurisdiction. However unjust a confiscation may be, a judicial condemnation closes the judicial eye upon its enormity. The right to demand redress belongs to the executive department, which alone represents the sovereignty of the nation in its intercourse with other nations.

The simple fact in this case is, that an individual is seeking, in the ordinary course of justice, redress against the act of a foreign sovereign. But the rights of a foreign sovereign cannot be submitted to a judicial tribunal. He is supposed to be out of the country, although he may happen to be within it.

An ambassador is unquestionably exempt from the ordinary jurisdiction; but if he commit violence it may be lawfully repelled by the injured individual—so if he commit public violence he may be opposed by the nation. This right arises from the necessity of the case. But as to ordinary cases he is to be referred to the tribunals of his own country. In cases where those tribunals cannot interfere to *prevent* the injury, the jurisdiction of the country, for that purpose, may interfere; but when the act is done, and prevention is too late, he must be referred to his own tribunals.

We claim for this vessel, an immunity from the ordinary jurisdiction, as extensive as that of an ambassador,

or of the Sovereign himself;—but no further.—If she SCHOONER
attempt violence, she may be restrained.

The constitution 'of the United States, decides no-
thing—it only provides, a tribunal, if a case can by pos-
sibility exist.

EX-
CHANGE
*v.*
M'FADDON
& OTHERS.

The statutes of the United States, are in hostility to
the idea of jurisdiction.—Private vessels are made liable
to confiscation, but public vessels are to be driven away.
The remedy is by opposing Sovereign to Sovereign,
not by subjecting him to the ordinary jurisdiction.

The jurisdiction over things and persons, is the same
in substance. The arrest of the thing is to obtain ju-
risdiction over the person.

A distinction is taken between civil and territorial ju-
risdiction, civil jurisdiction is referred to consent;—
it binds all who have consented. Territorial jurisdic-
tion goes farther; it operates upon those who have not
assented—such as *aliens*—but the alien must do some-
thing—he must come within the territory whereby he
submits to the jurisdiction—so if he purchases property
within the country, or sends property into the territory,
in *ordinary* cases, his assent is implied. But if the pro-
perty of an alien, be forcibly or fraudulently carried
within the territory, no consent is implied, and conse-
quently there is no ground for jurisdiction.

If a foreign Sovereign be found in the territory, he is
not liable to the ordinary jurisdiction. Vattel places
his exemption on the ground, that he did not intend to
submit to it.—Rutherford, on the ground of the assent
of the other Sovereign.

The case of the Ambassador is precisely in point—his
immunities depend upon the implied assent. The rea-
son is, that he may be independent. Grotius, places it
upon the conventional, and Rutherford, upon the natur-
al law of nations.

So in the case of the passage of troops through a
neutral territory, the permission to pass, implies a com-
pact, that they should enjoy all necessary immunities.

SCHOONER From the nature of the case, they cannot be subject to
EX-      the ordinary jurisdiction of the country, through which
CHANGE   they pass.  To suffer one of the soldiers to be arrested
v.       for a debt due to a citizen of that country, would be in-
M'FADDON consistent with the permission to pass.
&OTHERS.

We are asked, whence we infer the immunity of the
public armed vessel of a sovereign.  We answer from
the nature of sovereignty, and from the universal prac-
tice of nations from the time of *Tyre and Sidon*.

Sovereigns are equal.  It is the duty of a sovereign,
not to submit his rights to the decision of a *co-sovereign*.
He is the sole arbiter of his own rights.  He acknow-
ledges no superior, but God alone.  To his equals, he
shows respect, but not *submission*.

This vessel is not the ordinary property of a sove-
reign.—It is his *national* property—a public ship of war
duly commissioned.  There is no difference in princi-
ple between such a vessel, and an army passing through
the territory.  She has the same rights.  She has your
permission to pass, and you are bound to give her all
necessary immunities.  You gave her an asylum as
the property of a great and powerful nation, you must
not suffer her to be thereby entrapped in the fangs of a
municipal court.  She was charged with public despat-
ches ; she visited your ports *in itinere*.  It was a de-
flexion merely, that she might more effectually perform
her voyage.  It was a mere passage through your juris-
diction.  Her commander had an unquestionable right to
exclusive jurisdiction over her crew.  In the eye of the
law of nations, she was at home, whether in your ports,
or upon the high seas.  The exemption from delay, is
more necessary than the exemption from final condem-
nation.

By the usage of states, no other evidence is required
of the property of a sovereign than his commission and
flag.  This is strong evidence, that such property is not
subject to the ordinary jurisdiction of the country.
Otherwise other documents would be required and would
be furnished.  No others are required at sea, nor on
shore.  This usage of nations is universally known,
and as the vessel sailed upon the faith of such a usage,

good faith requires that you should receive the flag and
commission as evidence of the character of the vessel.

This court will not decide this case upon the authority of the slovenly treatise of Bynkershoek, or the ravings of that sciolist Martins, but upon the broad principles of national law, and national independence. One would as soon consult Gibbons or Hobbs, for the doctrines of our holy religion as Martins for the principles of the law of nations. Bynkershoek, upon this point, draws his authorities from Dutch courts, and Dutch jurists. Not one of his cases was adjudged, except that cited from Huber. And in one of the cases, the states general requested that the vessel should be discharged, which had been arrested in Zealand, for a debt due from Spain, saying that they would write to the Queen of Spain, to pay her debts, or they would be obliged to issue letters of marque and reprisal,—which was the proper course. The other cases were only abortive attempts to subject national property to the ordinary jurisdiction of the country.

The case of the Swedish convoy, was upon the ground, that the convoy resisted by force the right of search. It was *war quoad hoc* ; and the seizure was made as prize of war. But that case was never decided.

In the case of *Glass v. The Sloop Betsy*, the privateers commission was to capture the property of an enemy, but she had captured that of a friend.—The court did not subject the *privateer* to their jurisdiction, but the prize which she had wrongfully made.

*March 3d. All the Judges being present.*

MARSHALL, *Ch. J.* Delivered the opinion of the Court as follows :

This case involves the very delicate and important inquiry, whether an American citizen can assert, in an American court, a title to an armed national vessel, found within the waters of the United States.

The question has been considered with an earnest solicitude, that the decision may conform to those princi-

SCHOONER
EX-
CHANGE
*v.*
M'FADDON
& OTHERS

ples of national and municipal law by which it ought to be regulated.

In exploring an unbeaten path, with few, if any, aids from precedents or written law, the court has found it necessary to rely much on general principles, and on a a train of reasoning, founded on cases in some degree analogous to this.

The jurisdiction of *courts* is a branch of that which is possessed by the nation as an independent sovereign power.

The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.

All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.

This consent may be either express or implied. In the latter case, it is less determinate, exposed more to the uncertainties of construction; but, if understood, not less obligatory.

The world being composed of distinct sovereignties, possessing equal rights and equal independence, whose mutual benefit is promoted by intercourse with each other, and by an interchange of those good offices which humanity dictates and its wants require, all sovereigns have consented to a relaxation in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers.

This consent may, in some instances, be tested by common usage, and by common opinion, growing out of that usage.

A nation would justly be considered as violating its faith, although that faith might not be expressly plighted, which should suddenly and without previous notice, exercise its territorial powers in a manner not consonant to the usages and received obligations of the civilized world.

This full and absolute territorial jurisdiction being alike the attribute of every sovereign, and being incapable of conferring extra-territorial power, would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects. One sovereign being in no respect amenable to another ; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him.

This perfect equality and absolute independence of sovereigns, and this common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to wave the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation.

1st. One of these is admitted to be the exemption of the person of the sovereign from arrest or detention within a foreign territory.

If he enters that territory with the knowledge and license of its sovereign, that license, although containing no stipulation exempting his person from arrest, is universally understood to imply such stipulation.

Why has the whole civilized world concurred in this construction ? The answer cannot be mistaken. A foreign sovereign is not understood as intending to subject himself to a jurisdiction incompatible with his dignity, and the dignity of his nation, and it is to avoid this sub-

SCHOONER
EX-
CHANGE
v.
M'FADDON
& OTHERS.
jection that the license has been obtained. The cha-
racter to whom it is given, and the object for which it
is granted, equally require that it should be construed
to impart full security to the person who has obtained it.
This security, however, need not be expressed; it is im-
plied from the circumstances of the case.

Should one sovereign enter the territory of another,
without the consent of that other, expressed or implied,
it would present a question which does not appear to be
perfectly settled, a decision of which, is not necessary
to any conclusion to which the Court may come in the
cause under consideration. If he did not thereby ex-
pose himself to the territorial jurisdiction of the sove-
reign, whose dominions he had entered, it would seem to be
because all sovereigns impliedly engage not to avail
themselves of a power over their equal, which a ro-
mantic confidence in their magnanimity has placed in
their hands.

2d. A second case, standing on the same principles
with the first, is the immunity which all civilized na-
tions allow to foreign ministers.

Whatever may be the principle on which this immu-
nity is established, whether we consider him as in the
place of the sovereign he represents, or by a political
fiction suppose him to be extra-territorial, and, there-
fore, in point of law, not within the jurisdiction of the
sovereign at whose Court he resides; still the immuni-
ty itself is granted by the governing power of the nation
to which the minister is deputed. This fiction of ex-
territoriality could not be erected and supported against
the will of the sovereign of the territory. He is suppos-
ed to assent to it.

This consent is not expressed. It is true that in
some countries, and in this among others, a special
law is enacted for the case. But the law obviously
proceeds on the idea of prescribing the punishment of
an act previously unlawful, not of granting to a foreign
minister a privilege which he would not otherwise
possess.

The assent of the sovereign to the very important
and extensive exemptions from territorial jurisdiction

which are admitted to attach to foreign ministers, is implied from the considerations that, without such exemption, every sovereign would hazard his own dignity by employing a public minister abroad. His minister would owe temporary and local allegiance to a foreign prince, and would be less competent to the objects of his mission. A sovereign committing the interests of his nation with a foreign power, to the care of a person whom he has selected for that purpose, cannot intend to subject 'is minister in any degree to that power; and, therefore, a consent to receive him, implies a consent that he shall possess those privileges which his principal intended he should retain—privileges which are essential to the dignity of his sovereign, and to the duties he is bound to perform.

In what cases a minister, by infracting the laws of the country in which he resides, may subject himself to other punishment than will be inflicted by his own sovereign, is an inquiry foreign to the present purpose. If his crimes be such as to render him amenable to the local jurisdiction, it must be because they forfeit the privileges annexed to his character; and the minister, by violating the conditions under which he was received as the representative of a foreign sovereign, has surrendered the immunities granted on those conditions; or, according to the true meaning of the original assent, has ceased to be entitled to them.

3d. A third case in which a sovereign is understood to cede a portion of his territorial jurisdiction is, where he allows the troops of a foreign prince to pass through his dominions.

In such case, without any express declaration waving jurisdiction over the army to which this right of passage has been granted, the sovereign who should attempt to exercise it would certainly be considered as violating his faith. By exercising it, the purpose for which the free passage was granted would be defeated, and a portion of the military force of a foreign independent nation would be diverted from those national objects and duties to which it was applicable, and would be withdrawn from the control of the sovereign whose power and whose safety might greatly depend on retain-

SCHOONER EXCHANGE v. M'FADDON &OTHERS.

SCHOONER ing the exclusive command and disposition of this force.
EX-      The grant of a free passage therefore implies a waver
CHANGE of all jurisdiction over the troops during their passage,
v.      and permits the foreign general to use that discipline,
M'FADDON and to inflict those punishments which the government
&OTHERS. of his army may require.

But if, without such express permit, an army should
be led through the territories of a foreign prince, might
the jurisdiction of the territory be rightfully exercised
over the individuals composing this army?

Without doubt, a military force can never gain immu-
nities of any other description than those which war
gives, by entering a foreign territory against the will of
its sovereign. But if his consent, instead of being ex-
pressed by a particular license, be expressed by a gener-
al declaration that foreign troops may pass through a
specified tract of country, a distinction between such
general permit and a particular license is not perceiv-
ed. It would seem reasonable that every immunity
which would be conferred by a special license, would be
in like manner conferred by such general permit.

We have seen that a license to pass through a territo-
ry implies immunities not expressed, and it is material
to enquire why the license itself may not be presumed?

It is obvious that the passage of an army through a
foreign territory will probably be at all times inconveni-
ent and injurious, and would often be imminently danger-
ous to the sovereign through whose dominion it passed.
Such a practice would break down some of the most de-
cisive distinctions between peace and war, and would
reduce a nation to the necessity of resisting by war an
act not absolutely hostile in its character, or of exposing
itself to the stratagems and frauds of a power whose in-
tegrity might be doubted, and who might enter the country
under deceitful pretexts. It is for reasons like these
that the general license to foreigners to enter the domin-
ions of a friendly power, is never understood to extend
to a military force; and an army marching into the
dominions of another sovereign, may justly be consider-
ed as committing an act of hostility; and, if not opposed
by force, acquires no privilege by its irregular and im-

proper conduct. It may however well be questioned whether any other than the sovereign power of the state be capable of deciding that such military commander is without a license.

But the rule which is applicable to armies, does not appear to be equally applicable to ships of war entering the ports of a friendly power. The injury inseparable from the march of an army through an inhabited country, and the dangers often, indeed generally, attending it, do not ensue from admitting a ship of war, without special license, into a friendly port. A different rule therefore with respect to this species of military force has been generally adopted. If, for reasons of state, the ports of a nation generally, or any particular ports be closed against vessels of war generally, or the vessels of any particular nation, notice is usually given of such determination. If there be no prohibition, the ports of a friendly nation are considered as open to the public ships of all powers with whom it is at peace, and they are supposed to enter such ports and to remain in them while allowed to remain, under the protection of the government of the place.

In almost every instance, the treaties between civilized nations contain a stipulation to this effect in favor of vessels driven in by stress of weather or other urgent necessity. In such cases the sovereign is bound by compact to authorize foreign vessels to enter his ports. The treaty binds him to allow vessels in distress to find refuge and asylum in his ports, and this is a license which he is not at liberty to retract. It would be difficult to assign a reason for withholding from a license thus granted, any immunity from local jurisdiction which would be implied in a special license.

If there be no treaty applicable to the case, and the sovereign, from motives deemed adequate by himself, permits his ports to remain open to the public ships of foreign friendly powers, the conclusion seems irresistable, that they enter by his assent. And if they enter by his assent necessarily implied, no just reason is perceived by the Court for distinguishing their case from that of vessels which enter by express assent.

SCHOONER
EX-
CHANGE
v.
M'FADDON
& OTHERS.
————————

In all the cases of exemption which have been reviewed, much has been implied, but the obligation of what was implied has been found equal to the obligation of that which was expressed. Are there reasons for denying the application of this principle to ships of war?

In this part of the subject a difficulty is to be encountered, the seriousness of which is acknowledged, but which the Court will not attempt to evade.

Those treaties which provide for the admission and safe departure of public vessels entering a port from stress of weather, or other urgent cause, provide in like manner for the private vessels of the nation; and where public vessels enter a port under the general license which is implied merely from the absence of a prohibition, they are, it may be urged, in the same condition with merchant vessels entering the same port for the purposes of trade who cannot thereby claim any exemption from the jurisdiction of the country. It may be contended, certainly with much plausibility if not correctness, that the same rule, and same principle are applicable to public and private ships; and since it is admitted that private ships entering without special license become subject to the local jurisdiction, it is demanded on what authority an exception is made in favor of ships of war.

It is by no means conceded, that a private vessel really availing herself of an asylum provided by treaty, and not attempting to trade, would become amenable to the local jurisdiction, unless she committed some act forfeiting the protection she claims under compact. On the contrary, mot. s may be assigned for stipulating, and according immunities to vessels in cases of distress, which would not be demanded for, or allowed to those which enter voluntarily and for ordinary purposes. On this part of the subject, however, the Court does not mean to indicate any opinion. The case itself may possibly occur, and ought not to be prejudged.

Without deciding how far such stipulations in favor of distressed vessels, as are usual in treaties, may exempt private ships from the jurisdiction of the place, it may safely be asserted, that the whole reasoning upon which such exemption has been implied in other cases,

applies with full force to the exemption of ships of war in this.

"It is impossible to conceive," says Vattel, "that a Prince who sends an ambassador or any other minister can have any intention of subjecting him to the authority of a foreign power; and this consideration furnishes an additional argument, which completely establishes the independency of a public minister. If it cannot be reasonably presumed that his sovereign means to subject him to the authority of the prince to whom he is sent, the latter, in receiving the minister, consents to admit him on the footing of independency; and thus there exists between the two princes a tacit convention, which gives a new force to the natural obligation."

Equally impossible is it to conceive, whatever may be the construction as to private ships, that a prince who stipulates a passage for his troops, or an asylum for his ships of war in distress, should mean to subject his army or his navy to the jurisdiction of a foreign sovereign. And if this cannot be presumed, the sovereign of the port must be considered as having conceded the privilege to the extent in which it must have been understood to be asked.

To the Court, it appears, that where, without treaty, the ports of a nation are open to the private and public ships of a friendly power, whose subjects have also liberty without special license, to enter the country for business or amusement, a clear distinction is to be drawn between the rights accorded to private individuals or private trading vessels, and those accorded to public armed ships which constitute a part of the military force of the nation.

The preceding reasoning, has maintained the propositions that all exemptions from territorial jurisdiction, must be derived from the consent of the sovereign of the territory; that this consent may be implied or expressed; and that when implied, its extent must be regulated by the nature of the case, and the views under which the parties requiring and conceding it must be supposed to act.

*SCHOONER EX-CHANGE v. M'FADDON & OTHERS.*

SCHOONER
EX-
CHANGE
*v.*
MᶜFADDON
&OTHERS.
_____

When private individuals of one nation spread them-selves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dange-rous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country. Nor can the foreign sovereign have any motive for wishing such exemption. His subjects thus passing into foreign countries, are not employed by him, nor are they engaged in national pursuits. Con-sequently there are powerful motives for not exempting persons of this description from the jurisdiction of the country in which they are found, and no one motive for requiring it. The implied license, therefore, under which they enter can never be construed to grant such exemption.

But in all respects different is the situation of a pub-lic armed ship. She constitutes a part of the military force of her nation; acts under the immediate and di-rect command of the sovereign; is employed by him in national objects. He has many and powerful motives for preventing those objects from being defeated by the interference of a foreign state. Such interference can-not take place without affecting his power and his digni-ty. The implied license therefore under which such vessel enters a friendly port, may reasonably be con-strued, and it seems to the Court, ought to be construed, as containing an exemption from the jurisdiction of the sovereign, within whose territory she claims the rites of hospitality.

Upon these principles, by the unanimous consent of nations, a foreigner is amenable to the laws of the place; but certainly in practice, nations have not yet asserted their jurisdiction over the public armed ships of a fo-reign sovereign entering a port open for their recep-tion.

Bynkershoek, a jurist of great reputation, has indeed maintained that the property of a foreign sovereign is not distinguishable by any legal exemption from the

property of an ordinary individual, and has quoted several cases in which courts have exercised jurisdiction over causes in which a foreign sovereign was made a party defendant.

Without indicating any opinion on this question, it may safely be affirmed, that there is a manifest distinction between the private property of the person who happens to be a prince, and that military force which supports the sovereign power, and maintains the dignity and the independence of a nation. A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual; but this he cannot be presumed to do with respect to any portion of that armed force, which upholds his crown, and the nation he is entrusted to govern.

The only applicable case cited by Bynkershoek, is that of the Spanish ships of war seized in Flushing for a debt due from the king of Spain. In that case, the states general interposed; and there is reason to believe, from the manner in which the transaction is stated, that, either by the interference of government, or the decision of the court, the vessels were released.

This case of the Spanish vessels is, it is believed, the only case furnished by the history of the world, of an attempt made by an individual to assert a claim against a foreign prince, by seizing the armed vessels of the nation. That this proceeding was at once arrested by the government, in a nation which appears to have asserted the power of proceeding in the same manner against the private property of the prince, would seem to furnish no feeble argument in support of the universality of the opinion in favor of the exemption claimed for ships of war. The distinction made in our own laws between public and private ships would appear to proceed from the same opinion.

It seems then to the Court, to be a principle of public law, that national ships of war, entering the port of a friendly power open for their reception, are to be consi-

dered as exempted by the consent of that power from its jurisdiction.

Without doubt, the sovereign of the place is capable of destroying this implication. He may claim and exercise jurisdiction, either by employing force, or by subjecting such vessels to the ordinary tribunals. But until such power be exerted in a manner not to be misunderstood, the sovereign cannot be considered as having imparted to the ordinary tribunals a jurisdiction, which it would be a breach of faith to exercise. Those general statutory provisions therefore which are descriptive of the ordinary jurisdiction of the judicial tribunals, which give an individual whose property has been wrested from him, a right to claim that property in the courts of the country, in which it is found, ought not, in the opinion of this Court, to be so construed as to give them jurisdiction in a case, in which the sovereign power has impliedly consented to wave its jurisdiction.

The arguments in favor of this opinion which have been drawn from the general inability of the judicial power to enforce its decisions in cases of this description, from the consideration, that the sovereign power of the nation is alone competent to avenge wrongs committed by a sovereign, that the questions to which such wrongs give birth are rather questions of policy than of law, that they are for diplomatic, rather than legal discussion, are of great weight, and merit serious attention. But the argument has already been drawn to a length, which forbids a particular examination of these points.

The principles which have been stated, will now be applied to the case at bar.

In the present state of the evidence and proceedings, the Exchange must be considered as a vessel, which was the property of the Libellants, whose claim is repelled by the fact, that she is now a national armed vessel, commissioned by, and in the service of the emperor of France. The evidence of this fact is not controverted. But it is contended, that it constitutes no bar to an enquiry into the validity of the title, by which the emperor holds this vessel. Every person, it is alleged, who is entitled to property brought within the jurisdiction of our Courts, has a

right to assert his title in those Courts, unless there be some law taking his case out of the general rule. It is therefore said to be the right, and if it be the right, it is the duty of the Court, to enquire whether this title has been extinguished by an act, the validity of which is recognized by national or municipal law.

If the preceding reasoning be correct, the Exchange, being a public armed ship, in the service of a foreign sovereign, with whom the government of the United States is at peace, and having entered an American port open for her reception, on the terms on which ships of war are generally permitted to enter the ports of a friendly power, must be considered as having come into the American territory, under an implied promise, that while necessarily within it, and demeaning herself in a friendly manner, she should be exempt from the jurisdiction of the country.

If this opinion be correct, there seems to be a necessity for admitting that the fact might be disclosed to the Court by the suggestion of the Attorney for the United States.

I am directed to deliver it, as the opinion of the Court, that the sentence of the Circuit Court, reversing the sentence of the District Court, in the case of the Exchange be reversed, and that of the District Court, dismissing the libel, be affirmed.