Loring, J.,
delivered the opinion of the court:
The few facts in this case which the majority of the court deem material are, that the ship Essex, belonging to the petitioner, a Prussian subject, was detained at New Orleans for twenty days, by the order of General Butler, the military commandant of the city, on the alleged ground that she had on *379 board articles contraband of war; and tbat by such detention of his vessel the petitioner sustained the loss stated in the finding of facts.
That New Orleans was under martial law, and in a state of siege by land, and threatened by recognized belligerents without, and their more dangerous accessories within; that General Butler’s instructions enjoined upon him the strictest watchfulness, and that his position required of him prompt action, and that his information and the circumstances at the time justified the belief on which he acted: all these things, we think, are immaterial, because they in no way inculpate the petitioner or lessen the damages he has sustained, without fault on his part or on the part of his agents, the master and crew of his vessel } for it was proved, and not questioned, that the vessel was laden according to the requirements of law, under permits from the custom-house, and in the presence of a custom-house officer on board, and with all the formalities of procedure used at the port of New Orleans.
And the petitioner was in the exercise of his right. He was engaged in that foreign commerce which the President’s proclamation had invited to our shores, and to which it had opened the port of New Orleans by removing its blockade, and for the due security of which it had pledged the public faith. And the petitioner was, moreover, a subject of the King of Prussia, a friendly power, with whom, from our earliest days as'a nation, treaties of amity and commerce had established the measure of mutual national obligations and prescribed the modes of procedure in cases like this, that peace and good-will between the countries might not be interrupted.
The subsisting treaty between Prussia and the United States in 1862 was the treaty of 1828, (8 Stat. L., p. 384,) which revived and adopted the thirteenth article of the treaty of 1799, (8 Stat. L., p. 168;) and that article is as follows :
“Article XIII. And in the same case of one of the -contracting parties being engaged in war with any other power, to prevent all the difficulties and misunderstandings that usually arise respecting merchandise of contraband, such as arms, ammunition, and military stores of every kind, no such articles carried in the vessels, or by the subjects or citizens of either-party, to the enemies of the other, shall be deemed contraband so as to induce confiscation or condemnation and a loss of prop *380 erty to individuals. Nevertheless, it shall be lawful to stop such vessel and articles, and to detain them for such length of time as the captors may think necessary to prevent the inconvenience or damage that might ensue from their proceeding; paying, however, a reasonable compensation for the loss such arrest shall occasion to the proprietors; and it shall further be allowed to use in the service of the captors the whole or any part of the military stores so detained, paying the owners the full value of the same, to be -ascertained by the current price at the place of its destination. But in the case supposed of a vessel stopped for articles of contraband, if the master of the vessel stopped will deliver out the goods supposed to be of contraband nature, he shall be admitted to do it, and the vessel shall not, in that case, be carried into any port, nor further detained, but shall be allowed to proceed on her voyage.”
And then follows a specification of contraband articles.
The preamble of the article declares its purpose to be “ to prevent all the difficulties and misunderstandings that usually arise respecting merchandise of contraband.” Thus the purpose of the article covers all cases of the detention of vessels for contraband merchandise on board, and the language of the article conforms to its purpose, and is to be so construed as to effect it.
The purpose of this provision is the maintenance of peace and good-will between the two countries; and for this it legitimizes and regulates between the parties the detention of vessels having on board goods contraband of war, whether such vessels are at sea or in port. And it authorizes either party to use such detention to prevent aid to his enemy and for his own protection against an apparent danger, and it necessarily makes each the judge of the instances and extent for which his safety may require the use of the right granted, and it fixes the price to be paid for its use by the government using it, and that price is the least that equity would permit, for it is merely an indemnity for the loss which the use of the right by one party for his own security may occasion to a subject of the other. On the evidence the United States have exercised the right thus purchased, and all that they are called upon to do is to pay the price; and the joint resolution of Congress sending this case here is only the means of ascertaining the fact of the detention and the amount of indemnity, if any is due.
*381 And it is no answer to this claim to say that the articles on board the vessel were not contraband of war, and that the United States were mistaken in the ground that they alleged for making the detention. For, none the less, the United States used the right they had purchased, and therefore should pay the price stipulated for the use of the right. What they were to pay for was not the benefit the detention secured to them, but the injury it did to a Prussian subject, and that is the same whether their allegation was or was not well founded. And the fact that the vessel was detained as having on board contraband articles is equally true, and therefore the detention is equally within the treaty, whether she had such articles on board or not.
It was urged in the defense that the action of General Butler was justifiable in the circumstances in which he acted. That may be so; and our decision does not conflict with that, for it does not rest on the ground that any wrong was done either by General Butler or the United States, but only on the ground that the United States exercised a right theyhad purchased, and are therefore bound to pay the price stipulated for the exercise of the right. The claim for which we render judgment does not sound in tort, but arises ex contractu, for a treaty is a contract. And that the petitioner in his petition claims as for a tort is immaterial, for our judgments are to be rendered on the law and the evidence; and that a claimant mistakes either is no reason for withholding from him that justice the law and. the evidence entitle him to.
As has been said, we think this case is within the words and purpose of the thirteenth article of the treaty; that seeks to prevent "all the difficulties and misunderstandings that usually arise respecting merchandise of contraband” on shipboard. And this it could not do unless it covered all cases of such detention, for all are equally within the mischief sought to be prevented.
And the treaty is, by the Constitution, “ the supreme law of the land,” and therefore all authority, legislative or executive, civil or military, is to be used in subordination to it, and is to be held to have been. And a treaty is a contract between nations, and where it concedes a right for a price, if the right is used the price is to be paid, to preserve the good faith be *382 tween tbe high contracting parties and the peace and good-will involved in it.
And if the case were not within the treaty, still we think that under the law of nations the claim for indemnity for the petitioner would be a valid claim as between the two nations, and there would be reason enough for the action of Congress in sending the claim here.
Undoubtedly the rule in American law is, that where a foreign subject comes into this country for business or travel, and he is here subjected to a wrong, he must take such remedy as our laws provide for the wrong, because by coming here he submits himself to oiir laws. This was decided by the Supreme Court in the case of the Exchange, (7 Cranch, 116,) in 1812, and the celebrated opinion of Chief Justice Marshall has since been made part of the standard text-books on international law. (Wheaton, Lawrence’s edition, 191, 8.) In the case cited, Chief Justice Marshall said: “ When private individuals of one nation spread themselves through another, as business or caprice may direct,' mingling indiscriminately with that other, or where merchant-vessels enter for the purpose of trade, it would obviously be inconvenient and dangerous to society, and would subject the laws to continual infraction and the government to degradation if such individuals did not owe temporary and local allegiance, and were not amenable, to the jurisdiction of the country.”
But this rule applies only to the standing laws of a country administered by its judicial tribunals, and it has no reference to martial law, which may exist in one place and not in another, and may exist to-day and not to-morrow, and depends on the will and discretion of a military officer, and has no other rule or measure. It never has been held that a foreign citizen submits himself to these, or for these abandons his right to protection from his sovereign, which is the consequence of his allegiance to his sovereign, who is bound to protect him, as he is bound to protect his flag, his public ships, his colonies, or his territories; and not only to protect him against wrong, but to assure to him indemnity against a loss to which another power subjects him for security to itself, for that rests on the same equity in which our Constitution provides that private property shall not be taken for public use without just compensation. And therefore in a case like this, if no treaty existed, the *383 question of loss inflicted, or an indemnity due, would be not between tbe military officer wbo inflicied the loss and the foreign subject who suffered it, but between the government under whose authority the officer acted and the government of the foreign subject, and under the law of nations and not under municipal law. And hence the diplomatic correspondence in this case between the two governments stated in the finding of facts. And we think it is in recognition not only of the treaty referred to, but also of the distinction between standing laws and martial law, and between individuals under the municipal law and between nations under the law of nations, that Congress has sent here this case, to which our general jurisdiction would not have extended, for us to ascertain the facts and the measure of indemnity due.
If the foreign subject had offended the laws of this country, and thereby incurred detention, or had forborne to do what he could reasonably do to avoid it, this might forfeit or qualify his right to indemnity. But nothing of the kind is shown here. On the contrary, it is shown that the master was willing and offered to land the articles specified, on the return to him of their bills of lading, and where the bills were returned to him he returned the goods specified in them to the shippers. As some of the bills of lading had been sent to Liverpool, they could not be delivered up to the captain, and therefore he did not return the cases those bills related to. And for this he assigned a sufficient reason — that his owner and his property would be liable to suit in Liverpool on the bills of lading. To this the captain had no right to subject his owner, to avoid the detention, because for that his owner had a certain indemnity, which the captain had no right to exchange for the uncertainty and cost of litigation; and it may well be doubted whether his surrender of the goods under the authority of General Butler would have justified him against the owners of the goods, for they might well say, “ You had an indemnity for the detention, and as you could not come to harm by that, you had no right to buy your exemption from it by the surrender of our property intrusted to you.”
And under the law of nations, or under the treaty, it was optional with the master, in the circumstances in which he was placed, whether he would surrender the goods or suffer the detention, and his exercise of an option allowed to him for his *384 benefit cannot be imputed tobim as an offense. And, under all the circumstances of the case, and for the reasons he himself declared from the first and persistently, we think his action in the matter was but a discreet and proper performance of his duty to his owner and the owners of the goods laden on board of the vessel.