# Commonwealth *v.* Young.

## [SEPTEMBER, 1818.]

The constitution of the United States prescribes the only mode by which they can acquire land as a sovereign power, and therefore they hold only as an individual when they obtain it in any other manner.

Under the act of congress of 2d August, 1813, authorizing the president of the United States to sell certain lands in Pennsylvania, which had been assigned to them by the late proprietary, but of which the jurisdiction never had been ceded by the state, a sale was effected by A. B. by public outcry. This was held to be a violation of the law of Pennsylvania of the 28th March, 1814, for the regulation of auctions, by which all sales of this description are to be made by persons commissioned by the governor of Pennsylvania.

ERROR to the Mayor's Court of the city of Pittsburgh. By the record returned, it appeared the question arose upon a special verdict. The cause was argued by *Wilkins*, for the commonwealth, and *Baldwin*, who appeared on behalf of the United States, under whose authority the defendant had acted.

TILGHMAN, C. J., was not present at the argument, and gave no opinion.

GIBSON, J.—The defendant was indicted in the mayor's court of this city, for selling a lot of ground by public outcry, to one Daniel Spears, in violation of the laws regulating auctions. It appears by the special verdict, that the title to the ground in question, and on which the government had erected Fort Fayette, was, by the late proprietary, vested in fee simple, in the United States, and that the fort, which had been used as barracks, a military depot, and place of defence, had been disused as such, a short time previous to the sale; but that Pennsylvania had never ceded her right of jurisdiction over this ground to the federal government. On the 2d of August, 1813, congress

[ Commonwealth *v.* Young. ]

authorized the president to sell it, without prescribing the mode; and the defendant was employed by the president to make sale of it by public outcry. Previous to the sale, he received notice from Dennis S. Scully, the city auctioneer, of the exclusive right of the latter to dispose of real property at auction within the city of Pittsburgh; notwithstanding which, he effected the sale. On these facts judgment was rendered for the defendant, by consent, for the purpose of bringing the question before this court; and it is now argued that the United States, being a sovereign power, did not, and could not, hold this ground subject to the municipal regulations of the state.

The decision must rest, I apprehend, on a few elementary principles that are very plain. Before the establishment of a federal government every state possessed full, complete, and absolute sovereign power. By the federal constitution a portion of that sovereignty was, for national purposes, transferred to the general government: the residue remained to the states. The sovereignty of the United States is derivative; that of the individual states inherent: but the authority of both is limited, being restricted to the exercise of powers applicable only to particular subjects; neither being sovereign to every purpose, and in every aspect, but only so, when acting within the prescribed limits of its authority. For all national purposes the United States is completely sovereign: for all domestic purposes, unless where there are express or strongly implied exceptions, each state is so. The jurisdiction of both, in the particular aspect in which each possesses the attributes of sovereignty, may, for national and state purposes, be exercised on the same subject and at the same time. In other cases the jurisdiction is exclusive. In the eighth section of the first article of the federal constitution, there is an accurate enumeration and definition of the objects to which the powers of the federal government extend, except the authority to pass laws to carry the preceding powers into execution,

[ Commonwealth v. Young. ]

which is necessarily indefinable. What is the extent of the federal sovereignty, as to soil and territorial jurisdiction? By the eighth clause of the section just mentioned, "Congress shall have power to exercise exclusive jurisdiction over such district not exceeding ten miles square, as may, by cession of particular states and the acceptance of congress, become the seat of the government of the United States; and to exercise like authority over all places purchased by the consent of the legislature of the state, in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings." There can be no doubt that under a purchase ratified by the legislature, pursuant to this clause, congress may, if they please, extinguish all state authority, legislative, executive and judicial; and exercise, within the limits of the district acquired, not only national, but municipal authority, as fully as a state can, within its own peculiar limits: for here the residue of complete sovereignty, after the grant to the federal government was carved out of it, is again united to the portion first transferred by the federal constitution, and is possessed by the United States, just as it at first was, by the state from which it emanated; with this difference, however, that when exercised for national purposes, it is general, and co-extensive in its obligation with the limits of the United States, and when exercised for municipal purposes it is local and co-extensive only with the district itself. But the lot was, in fact, not purchased in pursuance of the constitutional provision, having been obtained from the late proprietary; whether before or after his proprietary rights were assumed by the state is immaterial, as he held this lot as an individual in his private capacity, and it is besides expressly found that the state never parted with her jurisdiction over it. The United States, therefore, had no right of municipal legislation, as respected it. What power, then, can they exercise over property in the soil in a national view? I know none but that of tax-

ation. For that purpose congress has plenary authority, and may pass any law necessary to attain the end. In this respect alone, they have sovereign power over the right of soil, and in no other (except perhaps by an exercise of the doubtful right of making roads and canals) can they constitutionally effect it. Here they owned the fee simple of the ground; but that is not an attribute inseparable from sovereignty; for the ownership of the soil, and jurisdiction over it, may, and, in fact, usually do exist separately from each other. The one is always derived from the other; but each may be, and usually is the subject of a separate grant. Hence the necessity of ratification by the legislature of the state, to vest full sovereignty in the United States, where the purchase is with a view to exclude jurisdiction. The vendor passes the right of soil, and the state the right of municipal jurisdiction, which, added to national jurisdiction acquired by the constitution, invests the United States with full and absolute sovereignty over the ceded territory. Now had the United States any further power over this lot, than to dispose of it as an individual? As their sovereignty is derivative, they can hold land as a sovereign, only when it has been acquired pursuant to the provisions of the constitution. For special objects confided to the general government, a limited right of sovereignty over the soil, without a right to the soil itself, was imparted by the constitution; but this was so only in relation to those subjects on which congress had power to act. Then a right to the soil, and jurisdiction over it, being distinct matters, it follows that where one sovereign has the fee simple of land within the territory of another, the former holds in subordination to all the municipal regulations of the latter. There is no abasement in this; for in the days of feudal tenure, when the difference of rank between the lord and the vassal was marked by circumstances far from flattering to human pride, it was not uncommon for a sovereign, the tenant of a fief, to do homage for it to another,

even of inferior dignity. It is clear, then, that the United States, though sovereign for some purposes, did not, in relation to this lot, stand in the situation of a sovereign, but an individual; and if so, the *lex loci rei sitæ* must govern. In transferring property held as an individual, government must conform to the municipal laws of the place. *United States* v. *Crosby*, 7 Cranch 116. The lot was subject to taxation for state purposes, to the laws directing the mode of alienation, and, in short, every other state regulation that could operate on the property of an individual. For all these purposes the state was sovereign. On the other hand, congress, in the use of its legitimate powers, have a right to tax land, the property of a state, when it is not, at the same time, held in sovereignty, without any violation of state rights: for in the exercise of this power, both by the United States for national, and a single state for municipal purposes, each, respectively, is sovereign and each subordinate. If the act of congress had, as to the mode of sale, pretended to vest in the president a power paramount to state authority, it would have been unconstitutional and void. Such an assumption of power could be founded only on the doctrine of federal supremacy in all cases, whether national or municipal; and would, if tolerated, be the signal for destroying the power of the courts to pass on the constitutionality of any law, and, particularly, for abolishing the subjection of state legislation to the decisions of the federal judiciary: a result deeply to be deplored by every friend to civil liberty.

I shall now notice a few of the arguments urged in behalf of the defendant. It is asked, if the state can tax the property of the United States, why not an office under the federal government? Simply because a power of this sort would be inconsistent with the safety and very existence of the general government; and therefore a restriction of its exercise must necessarily be implied from the nature of the power itself. The case of a loan at a higher rate of

[ Commonwealth *v.* Young.]

interest than is established by the state laws, is provided for in the constitution; for congress, having power to borrow money, must necessarily have the ancillary power of fixing the terms; without which a power to borrow would be nugatory. So, a power to establish courts of justice, necessarily includes all powers requisite to carry the judgments of such courts into effect; and for this reason a sale by the marshal, under process of a federal court, would not, though made by public outcry, be a violation of the auction laws. But in all these cases, power is, by necessary and irresistible implication, given in the constitution. The exemption of the United States from payment of costs, is put as an analogous case; but this is confined to her own courts, and the reason of it is plain. Costs are not recoverable at common law, and there is no act of congress which imposes them on the federal government; but in a state court this exemption would not be allowed, even if there were an act of congress for it. Lastly, it is asked whether a sale under the authority of the state, herself, would contravene the auction laws? Certainly not; for being, for this purpose, perfectly sovereign, the dispensing power would rest with her; and as to the United States not being bound because not particularly named in the state laws, that depends on their claim to be treated as a sovereign, and must stand or fall with it. If the president, representing the United States, cannot dispense with a state law, his agent by him cannot shield himself under his authority. The judgment of the mayor's court ought therefore to be reversed, and judgment entered for the commonwealth.

DUNCAN, J.—This is a prosecution for the penalty under the act of 28th March, 1814, authorizing the appointment of an auctioneer for the borough of Pittsburgh, which enacts, that the said auctioneer shall have power, within the borough of Pittsburgh, to set up and expose to sale by

[ Commonwealth *v.* Young. ]

public auction and vendue, all and every houses and lots, land and goods, &c., and ·property of what nature and amount soever; and if any other persons than the said auctioneer or his deputy, shall be found selling or disposing of any property whatsoever, other than the said auctioneer or his deputy, by way of public vendue within the said borough, except sales made by executors or administrators, or sales on judicial process or by distress, such person so offending, and being thereof legally convicted before the court of quarter sessions, shall, for every such offence, forfeit the sum of one hundred dollars for the use of the poor of the borough.

The special verdict finds all the facts necessary to bring the defendant within the provisions of this act, unless the property sold stood in that situation, as that it was privileged and exempted from the operation of the act. The privilege of exemption is claimed on the ground that it was the property of the United States, sold under an act of congress: that the United States derived their title under the late proprietors of Pennsylvania: that the United States had erected a fort thereon, which had been used as a barrack, a military depot, and place of defence, but which had been disused as such for some short time before the sale. The special verdict further states, that the state never had ceded the jurisdiction to the United States.

It was contended, on the part of the defendant in error, that under the constitution of the United States, congress had the power to dispose of, and make all needful rules and regulations respecting the territory, or other property, belonging to the United States; and that if the state of Pennsylvania possessed the exclusive power of legislation, this act does not include the property of the United States, inasmuch as they are not expressly named.

The jurisdiction over this spot (being within the limits of Pennsylvania) must remain in the state, unless divested of it by the constitution of the United States, or some law of

her own. There cannot be concurrent legislation. It must exclusively belong to the one or the other. Such is the nature of real estate, that the *lex loci rei sitæ* must prevail universally. The eighth section of the eleventh article of the constitution of the United States, defines the legislative power of congress. The seventeenth provision enables congress to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states and the acceptance of congress, become the seat of the government of the United States; and to exercise like authority over all places purchased by consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings. This enumeration excludes an authority in all but the places enumerated. The legislation and authority of congress is confined to cessions by particular states for the seat of government, and purchases made by consent of the legislature of the state, for the purpose of erecting forts. The legislative power and exclusive jurisdiction remained in the several states, of all territory within their limits, not ceded to, or purchased by, congress, with the assent of the state legislature, to prevent the collision of legislation and authority between the United States and the several states. The cases of the jurisdiction of the United States as to territory, are clearly defined by the constitution of the United States. No misunderstanding can ever arise, because the cession must be made by the state to the United States, or the purchase made by the United States, with the consent of the state legislature. There is a legislative exposition by congress as early as 2d April, 1794. This first exercise of the power of congress under the constitution, proceeded from men of whom many were the framers of the constitution.

By that act it is provided that for the safe keeping of the military stores, there shall be established under the direction

of the president of the United States, three or four arsenals with magazines as he shall judge most expedient, in such places as will best accommodate the different parts of the United States, either or both of the arsenals heretofore used at Springfield and Carlisle, to be continued as part of the said number, at his discretion: provided, that none of the said arsenals be erected, until purchases of land necessary for their accommodation be made with the consent of the legislature of the state in which the same is intended to be erected.

This power is not delegated to the United States by the constitution, nor is it prohibited to the United States; and by the twelfth article of the amendment of the constitution, it is reserved to the United States respectively. If the lands held by the United States are not subject to the laws of the state, in whose limits they are, no crime committed in them could be the subject of state jurisdiction. Nor could it be of United States jurisdiction, unless in the two defined cases under the constitution. It would be a portion of territory out of the reach of any human tribunal; a sanctuary beyond the control of any human law. There is only one decision on this subject, *Commonwealth* v. *Ethan A. Clary*, 8 Mass. 72. It was an indictment for selling spirituous liquors within the town of Springfield, without license, against the form of a statute of that state; and it was there decided, that the courts of the commonwealth could not take cognizance of an offence committed on lands in the town of Springfield, which had been purchased by the United States, for the purpose of erecting an arsenal, &c., to which the consent of the commonwealth had been granted by statute. When the United States have determined to bring the territory under their own authority, they have followed the provision of the constitution, by obtaining the legislative assent of the state to the purchase, as in the case at Springfield. The objection occurred to the court, that if the laws of the commonwealth had no

force within the acquisition of congress, the inhabitants thereof could not exercise any civil or political privileges, under the laws of Massachusetts, in the town of Springfield. The consequence was admitted; but the court consider this no hardship, because the inhabitants are not interested in any election made within the state, or held to pay taxes imposed by its authority, nor bound by its laws.

The construction that congress, without the assent of the legislature, may purchase land within the limits of any state, and place a colony there, exempt from state jurisdiction, taxation and legislation, would indeed strike us with alarm. The most dreadful mischief would arise from this border jurisdiction: these little anomalies, dotted over the extent of a great state, having the inhabitants of those places, unrepresented either in state or general governments, exempt from taxation, and free from the operation of all law, and not punishable by the courts of another. The mode of acquiring and disposing of territory, whether by an individual or by the United States, must be regulated by the laws of the state in whose chartered limits it is. Is it or can it be law, that if the United States purchase land within this state, which by her laws declares all conveyances, not registered within six months, void as to subsequent purchasers; that the subsequent *bonâ fide* purchaser, without notice of such unregistered conveyance, should not be protected by the registry act? Suppose the agent of the United States had disposed of this property by lottery; would not the state law against lotteries attach to this? Could any of the garrison of fort Fayette sell liquor to any of the citizens, without incurring the penalty of the law? Suppose rape or murder committed within the precincts; have the state courts no jurisdiction? The United States courts clearly have not authority. Nor does the authority given by the fourth article, section third, of the constitution of the United States, (granting power to congress to dispose of and make rules respecting this or other property belong-

[Commonwealth *v*. Young.]

ing to the United States,) vest legislative power over a territory within the limits of a state. The territory of the United States then signifies that portion of land beyond the chartered boundaries of any state, or cessions of chartered boundaries that had been ceded by the respective states. These are denominated, by the acts of congress, territories. There is over them a territorial government. The fourth article gives full faith and credit to the public acts and records of any state, in all the states; and grants to congress the power of prescribing the manner of authentication and the effect; declares that citizens of each state shall be entitled to the privileges of citizens of every state; provides for the delivering up of fugitives; the organization of new states, and the disposition and regulation of the territories belonging to congress, and guaranties a republican form of government. To stretch the constitution beyond this, and because congress have a power to regulate and dispose of the territory and other property, that they may make laws for the disposition of it in a manner prohibited by the laws of the state in which it is situated, except in the two cases provided, would be a most mischievous construction, inconsistent with the general plan and special provision of the whole system, and introductive of the most destructive confusion, discord and anarchy. The argument of lands sold at auction for direct taxes has no application; for congress has express power, by the constitution, to levy and collect taxes. Possessing the power to levy and collect, the paramount means remains with them. It is incidental. But congress have authority to make all laws necessary to carry into execution any power vested in them by the constitution. But the counsel on the part of the defendant in error has insisted, that the act does not embrace the land of the United States, as the United States are not named expressly. This claim must have its foundation on the royal prerogative. And the argument is, that as the king of England is not bound by acts of parliament, unless

[ Commonwealth *v.* Young. ]

named, therefore that the United States, in the character of land holders, are not bound. The reason on which this rule is founded never could be applicable to this government. The general rule laid down is, that the king's rights shall not be barred or restrained by any statute, unless he be specially named; for, if he were specially named, this might be a reason for his withholding his assent. But even the king, though not named, may be precluded of such inferior claims as might belong, indifferently, to him or a subject, as the title to an advowson or landed estate; but not stripped of his ancient prerogative, nor of those rights which are incommunicable, and appropriated to him as appurtenant to his regal capacity. When it does not destroy the ancient prerogative, nor deprive the crown of any prior right, but only new-models it, such laws bind the king, though not named. *The King* v. *The Archbishop of Armagh*, 1 Strange 516, and 1 Woodes. 31. The king, as a landholder, would be bound in all statutes regulating the disposition of land. To these prerogative claims on the part of the United States, as sovereign rights, I cannot subscribe. The sovereign here is the state. The sovereignty was in the state before the adoption of the constitution. It is not ceded to the United States. It is consequently reserved unimpaired by the states. The United States holding lands within the state territory (unless in the cases specified by the constitution) hold them by the same tenure that individuals do. In the *United States* v. *Fisher*, 2 Cranch 358, the doctrine of the United States prerogative is slightly glanced at, and seems to have been abandoned in an inquiry respecting the priority claimed by the United States; and the right alone claimed on statutory provisions.

Paterson, J., puts these questions to one of the counsel, in a way expressive of his opinion. " Do you consider the doctrine of prerogative as extended to this country? Are the United States not bound by a law unless named in it?"

v

[ Commonwealth *v.* Young. ]

The counsel replied, "It has been so contended by some persons in this country." I believe it has been so decided in Pennsylvania under the insolvent act of the United States. Judge Peters made some report to congress, who passed a law specially respecting the debtors of the United States. Whatever opinion some may entertain with respect to the United States not being bound by act of congress, unless named in it, I own I cannot discover the reason of such opinion in our government. Where the state possesses the sovereign power undiminished by the constitution of the United States, and where her acts may bind the lands of the United States, within her territory, I am of opinion the United States and their rights are bound by her laws, though not expressly named, in the same manner as the lands of individuals are. The case of statutes of limitation proceed on the maxim that *nullum tempus occurrit regi;* on the ground that the king is so occupied in the arduous affairs of the government that he cannot attend to his own concerns; and therefore laches shall not be imputed to him, unless he is expressly named in the statute, and then he is bound by his own assent to the law. I am therefore of opinion that the judgment be reversed, and that judgment be entered for the penalty, &c.

As this question, though not important in point of value, involves the rights of the state, and of the United States, I am glad to find the opinion I have formed confirmed by the authors of the Federalist, a work always resorted to, and considered as of the highest authority in all constitutional questions. The third number of the Federalist, attributed to the late president of the United States, Mr. Madison, after treating of the cession for the seat of government, for forts, &c., shows the propriety of congress having exclusive jurisdiction; and then proceeds to justify the same provision as to forts, &c., as no less evidently necessary. The public money expended on such places, and the public property deposited in them requires that

they should be exempt from the authority of the particular states. Nor would it be proper for the places on which the entire security of the union may depend, to be, in any degree, dependent on a particular member of it. All objections and scruples are here obviated by requiring the concurrence of the states concerned in any such establishment.

Whereupon the judgment was reversed, and the court sentenced the defendant to pay a fine of one hundred dollars, for the use of the poor of the city of Pittsburgh, and the costs of prosecution.