MOTHERWELL et al. v. UNITED STATES ex rel. ALEXANDROFF.

(Circuit Court of Appeals, Third Circuit. February 25, 1901.)

No. 22.

1. TREATIES—CONSTRUCTION OF TREATY WITH RUSSIA—SURRENDER OF DESERTERS FROM SHIPS.

Article 9 of the treaty of 1832 between the empire of Russia and the United States, which authorizes consular officers of either country to apply to the competent tribunals of the other for the arrest, detention, and surrender of deserters from "ships of war and merchant vessels of their country," and provides that such deserters shall be surrendered "on proof, by the exhibition of registers of vessels, the rolls of the crew, or by other official documents, that such individuals formed part of the crews," cannot be extended beyond its terms, so as to apply to deserters generally; and it does not authorize the arrest and detention by the authorities of the United States, on application of a Russian consul, of a member of the Russian navy who, with others, had been sent to this country, in charge of an officer, to form part of the crew of a cruiser being built here for the Russian government, but which had not been completed or accepted, or its crew organized, at the time such person deserted.

2. HABEAS CORPUS—DISPOSITION OF PRISONER—POWERS OF FEDERAL COURTS.

Courts of the United States in habeas corpus proceedings have jurisdiction and authority, under Rev. St. § 761, "to dispose of the party as law and justice require"; and they are not constrained to discharge the prisoner absolutely, even though the particular proceedings and commitment by virtue of which he is held are unwarranted and illegal, but may order his surrender to any other person or authority showing a legal right to his custody.[1]

3. INTERNATIONAL LAW—ARREST OF DESERTERS FROM ARMY OR NAVY OF FOREIGN COUNTRY.

The rules of international comity do not require the authorities of the United States to apprehend and surrender deserters from the army or navy of a foreign government unless at the time of their desertion they formed part of an organized force within the United States by the express authority of the executive department of our government; and an order by the treasury department, made on request of an ambassador, that a detail of men from the navy of a foreign government, coming to this country for a temporary purpose, should be permitted to enter without examination or the payment of head money as immigrants, does not constitute such authority.

---

[1] Jurisdiction of federal courts, see note to In re Huse, 25 C. C. A. 4.

4. SAME—RELEASE ON HABEAS CORPUS.
   A deserter from the naval service of a foreign government, arrested and detained by the authorities of the United States on application of officers of that government, under the supposed requirements of a treaty, is not thereby placed in the constructive custody of such officers, so that his release in habeas corpus proceedings is in any manner an invasion of their right to immunity from the jurisdiction or process of our courts; and, when his arrest and detention by the United States authorities were not warranted either by the treaty or by the rule of comity, it is the duty of the courts to discharge him.

5. FEDERAL COURTS—SUITS INVOLVING INTERNATIONAL RELATIONS—SUGGESTION OF FACTS BY EXECUTIVE DEPARTMENT.
   In a proceeding in a federal court involving a question of international law, a suggestion filed by the district attorney, acting by authority of the executive department, is appropriate for the purpose of disclosing to the court facts not appearing in the record, but the legal effect of such facts is for determination exclusively by the court.

   Bradford, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 103 Fed. 198.

John F. Lewis and Samuel Dickson, for appellants.
Bernard Harris and Isaac Hassler, for appellee.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

DALLAS, Circuit Judge. Leo Alexandroff came to this country in October, 1899, in company with 53 men and an officer, all of whom, as well as himself, were members of the Russian navy. They were sent here to form part of the crew of the cruiser Variag, which was then in course of construction for the Russian government at the city of Philadelphia. The vessel was nearing completion, but was still on the stocks, and had not been accepted, when Alexandroff, who had not been aboard of her, went, without leave, from Philadelphia to the city of New York, where he soon obtained employment, and formally declared his intention to become a citizen of the United States. Having thus manifested his purpose to renounce the service in which he was enrolled, he was arrested upon the written request of the Russian vice consul, and on June 1, 1900, was committed by a United States commissioner to the prison of Philadelphia county, upon a mittimus which recited that the cause of his commitment was "desertion from the imperial Russian cruiser Variag," and that he had been apprehended upon the "complaint of the captain of the said cruiser Variag, in accordance with the terms of the treaty between the United States and Russia." Thereupon a writ of habeas corpus for his production was allowed by, and issued out of, the district court of the United States for the Eastern district of Pennsylvania. It was directed to the keeper of the prison, and to "Captain Vladimir Behr, Master of the Russian Cruiser Variag," but the only return thereto was made by the former, who produced the prisoner and submitted a copy of the commissioner's precept.

But a single question was argued and decided in the court below, namely, "whether article 9 of the treaty with Russia, signed in December, 1832, under which the arrest was made, justified the prisoner's detention." The learned district judge was of opinion that it did not, and we concur in his conclusion. The clause referred to is as follows:

"The said consuls, vice-consuls and commercial agents are authorized to require the assistance of the local authorities for search, arrest, detention and imprisonment of the deserters from ships of war and merchant vessels of their country. For this purpose they shall apply to the competent tribunals, judges and officers, and shall in writing demand such deserters, proving by the exhibition of the registers of vessels, the rolls of the crew, or by other official documents that such individuals formed part of the crews; and this reclamation being thus substantiated, the surrender shall not be refused."

The federal courts should, of course, unhesitatingly and with scrupulous fidelity exercise any jurisdiction they possess to effectuate the treaty obligations of the United States. But the scope of such obligations, as of ordinary contractual engagements, is to be determined by the terms of the instrument creating them; and by no reasonable construction of the article in question can it be made to comprise any undertaking with respect to deserters generally. On the contrary, deserters from ships of war and merchant vessels are distinctly specified, and therefore to such deserters only can the mutual stipulations of the contracting governments be related. "Expressio unius est exclusio alterius." If more had been intended, less would have been said; but it is in reality manifest that such an event as we are now concerned with was not contemplated at all, for it could not then have been anticipated that the circumstances necessary to its occurrence would ever arise. As was said by the learned judge below:

"The article in question is dealing with completed vessels, manned by organized crews, that may be visiting the ports of the foreign power, and to that subject its provisions must be confined."

The unfinished Variag was not a "ship," in the sense in which that word was used in the treaty. Completed ships were exclusively in mind. This, we think, is evident from the whole tenor of the article, and is made especially apparent by its provision for proof by documents which ordinarily pertain to perfected and entire vessels only. She certainly had not become a Russian ship, for under the contract for her construction the Russian government might still have rejected her. Moreover, it is hardly supposable that she would, in her then condition and situation, have had a crew, and the fact is that she had none. A number of men had been assigned for that service, but, as they had not entered upon it, there was as yet no crew in being, and Alexandroff's abandonment of those who were to form part of the projected crew cannot be said to have been a desertion "from the ship," for the undisputed evidence is that he had not at any time been aboard of her. The conclusion seems to be inevitable that the learned district judge was right in holding that the treaty under which the arrest was made did not justify it; but it is now further contended that, as an act of comity, irrespective of the treaty, an

order should have been made for the surrender of Alexandroff to the Russian vice consul or to Capt. Behr, and this contention has had our careful consideration.

In proceedings upon habeas corpus the authority of the courts of the United States is not so restricted as to compel them in every instance either to discharge the prisoner absolutely, or to remand him to the custody of the person producing him. These courts, at least, are empowered and required to "dispose of the party as law and justice require" (Rev. St. § 761), and if, under the law of nations and the facts of this case, any representative of the Russian government was entitled to have Alexandroff delivered to him, we do not doubt that he should have been so disposed of; and hence we are brought to inquire whether, under any rule of comity, having the force of law, and therefore judicially cognizable, such delivery was demandable. In dealing with this question we will assume the correctness of the proposition that, where sufficient ground for his detention is shown, a prisoner is not to be discharged for defects in the original arrest or commitment; but we cannot accede to the theory advanced in argument, that the keeper of the county prison, in detaining Alexandroff, was acting as the agent of Capt. Behr. He had no right to deprive him of his personal liberty upon the mere behest of any man, and it would be unjust to ascribe to him the arrogation of any such right. He detained the prisoner by virtue of a warrant issued by a public officer in seeming conformity with law, and that warrant, and nothing else, was set up in justification. It did, it is true, direct that the prisoner, unless discharged by due course of law, should be kept "subject to the order of the Russian vice consul at Philadelphia or of the master of the cruiser Variag," but this direction did not constitute the jailer the agent of either of those persons. It correctly defined the duty which would have devolved upon him if the commitment had been rightfully made under the treaty of 1832, but, as it was not, the direction which was given in supposed compliance with that treaty was simply inapposite and of no effect whatever. The situation, then, was, in fact and in law, this: Alexandroff was neither in the actual custody of Capt. Behr, nor under his control. He was detained solely and exclusively by the keeper of the prison, and Capt. Behr's inclusion in the writ of habeas corpus was unnecessary and redundant. He was not required to answer it, and upon the hearing it appeared that no order for the prisoner's discharge could with propriety or efficacy have been directed to him. In fact, he was not ordered to do anything whatsoever. His real position, therefore, was not that of a defendant who is constrained to respond to a demand, but of an intervener who himself asks the action of the court for the maintenance of a right to which he claims he is entitled. Consequently the precise question is not as to whether the courts of this country should compel an officer of a foreign navy to release a man who had come here under his command, but as to the right of such officer to require their assistance for the recapture of a deserter. From first to last this right has been asserted and insisted upon, and, if Alexandroff had been a member of a crew and had deserted from a Russian ship, its existence would be freely granted; for with respect

to "such deserters" it was unquestionably established by the treaty which has been discussed. But it is difficult to understand why the provision of that instrument requiring the local authorities, including judges, to surrender deserters, should have been confined to deserters from ships of war and merchant vessels, if, as is now contended, the law of nations had already imposed upon the courts the duty of surrendering all naval deserters, whether from ships of war or not. "Treaties are usually allied with a change of law" (Hall, Int. Law [4th Ed.] 12); and it is plain, we think, that the particular article under consideration was intended to create a new obligation, and not merely to prescribe how a subsisting one should (in certain only of the cases covered by it) be performed. Congress has quite distinctly indicated that its understanding of the matter accords with our own; for, in declaring the duties of the courts upon the subject, it has expressly restricted the applications upon which their interposition may be required to such as may be made on behalf of "any foreign government having a treaty with the United States" (Rev. St. § 5280); and, in our opinion, this restriction does not conflict with any duty imposed by international law.

That the public vessels of a state are exempt from attachment or arrest under the municipal law of a foreign nation, even when found in waters within its jurisdiction, must be acknowledged. The Exchange v. McFaddon, 7 Cranch, 116, 3 L. Ed. 287. And "it is well settled that a foreign army permitted to march through a friendly country, or to be stationed in it by permission of its government or sovereign. is exempt from the civil and criminal jurisdiction of the place." Coleman v. Tennessee, 97 U. S. 509, 24 L. Ed. 1118. But neither of these immunities is now in question. Neither of them has been invaded. Neither of them is impugned. No attempt has been made to subject a Russian vessel to any process of our courts, nor has exemption from their jurisdiction been denied to any member of the Russian army or navy. Alexandroff was arrested in pursuance of a request made by the Russian vice consul himself, and he was not in the custody of Capt. Behr at the time of his discharge. Consequently, neither the vice consul nor Capt. Behr was, at any stage or in any manner, coerced by or under the authority of the United States. The commitment was made upon the assumption that it was called for by the treaty of 1832, and when it appeared to the court inquiring "into the cause of restraint of liberty" (Rev. St. § 752) that this assumption was an erroneous one, it became the plain and imperative duty of that court, in the absence of any other ground for detaining the prisoner, to order his release. We agree that the application for his delivery to Capt. Behr legitimately presented a cognizable demand; but upon such an application, the party making it, who seeks the judgment of the court in his favor, becomes the actor. He invites the exercise of its jurisdiction. It is not imposed upon him. Furthermore, the rule of comity which accords to an army of one nation, when within the territory of another by its permission, the privilege which is here asserted, is not, in our opinion, pertinent to this case. We do not doubt that it is applicable to a marine force as well as to a land force, but as to either it respects organized bodies

only. A single regiment or a single crew, for instance, may be entitled to its allowance, but exemption from compliance with the law of the land is not to be conceded to any man or number of men merely because he or they happen to be in the military or naval service of a foreign state. Capt. Behr and those who came with him were members of the Russian navy, but as an aggregation they were not an integral component of it. It was intended that they should become part of an organization which was to be comprised in that navy, but that organization was still unformed. The men were, by Russian law, subject to the captain's control; but this did not of itself make them, when conjointly considered, a constituent unit of the Russian navy, for at the time in question no such unification had been effected. If there had been but 2 or 3, instead of more than 50, men under his command, it could hardly have been argued, we think, that they and he should, for the present purpose, be regarded as representative of the Russian navy; and surely the existence or nonexistence of such representative character cannot be dependent upon the number of persons who may be alleged to be clothed with it. The true criterion rests upon the obvious distinction between the concrete parts into which a navy is usually divided and its individual members. The former stand for the navy; the latter do not. The individuals who were detailed for the purpose of partially manning the Variag were not marching through this country; nor were they, in the ordinary sense of the word, stationed here. If the Russian government had requested their recognition and admission as a distinctive part of its navy, and that request had been acceded to by the executive department of our government, a different situation would have been presented, with respect to which we need express no opinion; for the fact is that no permission for their landing was either asked or given, and we have not been persuaded that any one concerned supposed it to be requisite, or had any thought of invoking or conceding any immunity which might have accrued from it. The treasury department, by its letter of October 4, 1899, did not assume to confer or define any privileges other than those which were mentioned in it. The Russian ambassador, to whom it was probably addressed, was merely informed that the usual examination would be waived, and that no head tax would be demanded; and it is simply impossible to infer from this relinquishment of those particular exactions that it was either intended or understood that the persons referred to were, after landing, to be regarded as or treated like a foreign army. Such effect could not be attributed to that communication without grossly perverting its plain meaning, and transforming an act of common courtesy on the part of the treasury department with relation to matters within its province into an international compact which it would have no authority whatever to make.

The learned district attorney for the Eastern district of Pennsylvania, acting by executive authority, has suggested in writing that Alexandroff should be remanded to the county prison to await the orders of Capt. Behr. This suggestion will now be filed in the office of the clerk of this court, but, as it is not, in our opinion, well founded in law, it necessarily results that it cannot prevail. It presents no

facts which do not appear upon the record before us, and the legal effect of those facts is for determination exclusively by the court. The present case is not, in this respect, at all like that of The Exchange, in which Marshall, C. J., observed:

"If this opinion be correct, there seems to be a necessity for admitting that the fact might be disclosed, to the court by the suggestion of the attorney for the United States."

We have reached the conclusion that neither the treaty which was at first relied on, nor the rule of comity which has since been pressed upon our attention, is applicable to the facts now presented; and therefore the order which was made by the district court must be, and is, affirmed.

GRAY, Circuit Judge. Although I agree in the conclusion reached by Judge DALLAS, I deem it necessary to state, as briefly as possible, the grounds upon which I hold that the relator should be discharged.

The learned judge of the court below was undoubtedly right, as the case was presented to him, in declining to hold Alexandroff, and in ordering his discharge. We surrender deserting seamen from foreign vessels, whether of war or of merchant marine, only under the obligation of treaties (1 Moore, Extrad. p. 612, § 408); and it was under the provisions of our treaty with Russia in that regard that it was claimed that Alexandroff was arrested and held subject to the order and requisition of Capt. Behr, who was in command of the detail of men belonging to the Russian navy, and awaiting the completion of the ship of war Variag, then on the stocks at Cramps' Shipyards in Philadelphia. That his arrest and detention under color of process issued in pursuance of the stipulations of said treaty, and of the act of congress passed to carry out the same, were unjustified and illegal, has been fully and clearly shown in the principal opinion in this case. It is also clear, as stated in that opinion, that under the provisions of section 761 of the Revised Statutes the court below were not constrained to set the relator at liberty, even though the particular proceedings, and commitment pursuant thereto, by which he was held, were unwarranted and illegal. If, under the obligations of public law, or of the comity usually exercised between friendly nations, there was a duty on the part of the government of the United States to aid Capt. Behr in the capture of a deserter from his force, or to recognize the right of the commander of that force, in the exercise of military discipline, to cause his forcible arrest and detention by those under his command, it would have been the judicial duty of the court below to surrender the relator into the custody of the commander of that force, notwithstanding the indefensibility of the particular proceedings under which he was arrested. No claim on this ground appears to have been urged at the hearing of the cause in the court below. Notwithstanding this, we agree in holding that this contention may be made upon proper grounds before this court, and, if sustained, this court would be authorized to, and should, reverse the judgment of the court below, and order the relator to be delivered to the custody of the commanding officer of the Russian naval

force. Accordingly, it has been urged with force and ability in the argument of this appeal that Alexandroff was a member of a detail of the military forces of the czar of Russia; that, organized as such, under command of proper officers, this military detail came to this country to form part of the crew of a Russian man of war then building for the Russian government at Philadelphia, and proceeded from the port of debarkation to that city, there to await the completion of the ship which they were intended to man. The claim is made that under the rules of international law this force was entitled to have extended to it the comity which is due where the army or an organized portion of the military force of one sovereign enters upon or crosses the soil of another with the permission of the latter. It is true that, if such permission is given, then there is implied a right or privilege in the commander of such organized military body to enforce discipline, which would include the right to arrest and detain a deserter, and also to be exempt from the operation of the civil and criminal laws of the country through which he is passing or in which he is remaining. But while this comity and these privileges and immunities flow from and are implied in such a permission from the sovereign of the soil, and do not require to be distinctly enumerated or stated, it is also true that the permission of such sovereign must be express, and is not to be implied. This seems the settled doctrine, founded on the opinion of Chief Justice Marshall in the celebrated case of The Exchange, 7 Cranch, 116, 3 L. Ed. 287, which has not only stated, but has become the received expression of, international law on this subject.

While it is usual to speak of the "armies" of one sovereign crossing or remaining upon the soil of another, with the permission of the latter, as entitled to this comity, there is nothing in the reason of the rule, or of the authorities in support of it, which would deny this comity to any organized military force, however small, provided it was large enough to be susceptible of military organization and of acting offensively or defensively. In this case, therefore, I am of opinion that the detail of 58 men, if organized as part of the military and naval force of Russia, and coming here for the purpose disclosed in the record, might sufficiently possess the character that would, so far as this case is concerned, be entitled to receive and enjoy the comity and privileges flowing from such a permission as we have already described, if properly granted by our government. The record, however, is fatally defective, in that it does not disclose the absolutely essential fact that permission was given to such a force, or to the representative of its sovereign, to enter this country as an organized military body. In a matter so important as the assertion of the sovereignty of another country upon our soil, nothing but the clearest evidence of that executive permission from our government, which international law demands as a prerequisite to the enjoyment of those privileges which flow from comity, will justify the assertion of such a claim. When asked for the evidence of such executive permission, we are pointed by the appellants to the record, for a copy of the letter of the acting secretary of the treasury, dated October 4th, 1899:

"No. 19,805.                Treasury Department.
                 "Office of the Secretary.
                            "Washington, D. C., October 4, 1899.
    "Sir:  Acknowledging the receipt of your letter of 24th ultimo, No. 557, I
have the honor to inform you that, in compliance with request contained
therein, instructions have been issued to the commissioner of immigration at
the port of New York to admit without examination the detail of one officer
and fifty-three regular sailors whom you state have been detailed to this
country for the purpose of partially manning the cruiser now under con-
struction for the Russian government at Cramp's Shipyard in Philadelphia,
Pennsylvania.  The collector of customs has also been advised that the usual
head tax of $1.00 is not to be collected in this case.
    "Respectfully yours,          O. L. Spaulding, Acting Secretary.
                                             "T. U. S."

    This letter, it will be observed, has no address, and there is nothing
in the record to show to whom it was written.  We are told by coun-
sel, and it seems to be assumed, that it was written to the Russian
ambassador; but, even when we assume this, it falls far short of con-
veying to this court the information that is absolutely necessary for
the contention of the appellants in this case, to wit, that the requisite
permission was granted by the president to the Russian government
to land, march across our country, and indefinitely hold therein a
military force of the czar of Russia.  Whether they were admitted
as a military organization or not, they clearly were not immigrants,
and therefore not amenable to the immigration inspection laws, nor
to the head tax imposed and collected by the customs authorities
from immigrants.  The same response would have been made as to
any civil employés of the Russian government coming here tempo-
rarily in the government service.  There is no evidence whatever
that more was intended on either side.  The evidence is quite the
other way.  It does not appear what the request of the Russian am-
bassador was, to which this letter is said to be a reply.  The wording
of the treasury department's letter does not necessarily imply a re-
quest from the Russian government that these men should be permit-
ted to land as a military force.  For an illustration of how informa-
tion from the executive is conveyed through the secretary of state, in
direct and categorical terms, see letter of Mr. Webster, secretary of
state, to Mr. Crittenden, attorney general, March 15, 1841, in the
Case of McLeod, 6 Webst. Works, 262.  And it is to be observed
that, where the executive permission in question is given, it is given
by the president, through the secretary of state, who is the sole organ
of executive authority for communication with foreign powers.
    But reliance is also placed upon a matter that does not belong to the
record, and forms no part of the proceedings in the court below.  We
refer to the suggestion made in this court for the first time by the dis-
trict attorney of the United States for the Eastern district of Penn-
sylvania.  It is claimed that this suggestion, purporting to be made
by the direction of the executive authority of the United States, is
binding upon this court.  We do not deny that a suggestion so made
by the proper law officer, representing in that regard the executive,
might be an appropriate vehicle to convey from the executive to this
court information of the fact, if fact it be, that this detail of men

from the Russian navy, under Capt. Behr, had received the permission of the executive of this country to land at New York, cross over to Philadelphia, and there remain as a part of the organized military force of the czar of Russia. It may be admitted that direct and positive information so given would conclude this court as to the question of fact which was the subject of such information, and thus change the aspect under which we are now compelled to view the case. But no such information from the executive was conveyed, or attempted to be conveyed, by the suggestion filed. The district attorney merely undertakes, in obedience to the stated direction of the executive, to call the attention of this court to the facts disclosed in the record, and to state argumentatively a construction which he thinks should be placed thereon. The interpretation of the record in this case is the function of the court, and not of the executive, and the suggestion is in this respect irrelevant. The suggestion of the district attorney, as we have seen, does not disclose the fact of any permission having been given by the executive to the Russian authorities to land and maintain this detail of men as a military organization of the Russian government. It does not even expressly state that the executive of the United States, because of the facts recited from the record, recognizes the naval detail under Capt. Behr as an organized military force present on our soil by the requisite permission of the executive authority of this country. International law does not sanction the intrusion of the military forces of one sovereign upon the soil of another by any implied permission of the latter. The presence of such an armed body is so serious and important a matter, involving as it does a diminution of the sovereignty of a country whose soil is thus occupied, that nothing but express permission from the sovereign of such country can justify it. Without such permission, such intrusion is a hostile act, and would have to be defended by the sovereign of such troops as an act of war, or as justified by some supreme necessity, which comity would require to be accepted as an excuse. It is true that a different rule obtains in the case of the ships of war of one sovereign visiting the ports and waters of another. There is an implied authority among nations to tolerate this, and extend to such visits an international comity founded on universal custom and usage among nations. This difference results obviously from the different nature of the intrusion in the one case from that in the other. Ships of war, from their vagrant character, constantly demand the hospitality of foreign waters. They were made to traverse the waters of the world, and all nations find that their interests and security demand free ingress to and egress from the ports of friendly nations. The character of their operations and activities differs as widely from those of an army as the sea does from the land. Yet, as we have seen, deserters from such ships in a foreign port, though there by the implied permission of its sovereign, cannot be recaptured, except in pursuance of the stipulations of a treaty. Nor can the rule of comity here in question be invoked for such a ship's company, or a portion thereof, when landed on foreign soil. The permission implied in case of the ship of war does not extend to the crew or ship's company when landed. When they go ashore, even

as an organized body, they ordinarily become subject to the local laws.

I am of opinion, therefore, that there is no evidence, either in the record of this case or in the suggestion filed by the district attorney, that the permission of the executive, requisite to invoke the exercise of the comity claimed, was ever granted to the Russian government or its representative in respect to this detail of men under Capt. Behr.

BRADFORD, District Judge (dissenting). I dissent from the judgment of the court in this case on the ground that, in my opinion, by the principles of international comity as recognized in t s country and declared by the Supreme Court Captain Behr has a right to exercise discipline over the Russian naval force which came to this country in his charge, including the power to arrest and have custody of Leo Alexandroff, the relator, as a deserter. This ground was not discussed or even considered by the learned judge who decided the case in the court below; nor am I aware that it was presented to him in argument. He said:

"The single question for decision is whether Article IX of the treaty with Russia, concluded in December, 1832, under which the arrest was made, justifies the prisoner's detention."

If the case had involved only the point on which it was decided below there could be little doubt as to the correctness of the decision. But in this court it has been presented in a new and very different aspect. The record shows that the relator and the other Russian sailors under command of Captain Behr came to this country as members of the Russian navy, under orders to form part of the crew of the cruiser Variag, a war vessel, then in course of construction for the Russian government at the ship yard of The William Cramp & Sons Ship & Engine Building Company in Philadelphia under a contract between that company and the Russian Ministry of Marine. The men composing this detail were subjects of Russia and in the service and pay of Russia, formed part of the military force of that empire, came to this country in a body under military discipline, and in a body entered on our soil, not as private individuals severally bound on business or pleasure, but for the specific and strictly public purpose of manning a cruiser about to be turned over to the Russian government. The broad principles which should be determinative of this case are stated with admirable clearness and force in The Exchange v. McFaddon, 7 Cranch, 116, 3 L. Ed. 287. Chief Justice Marshall delivering the opinion of the court said:

"The world being composed of distinct sovereignties, possessing equal rights and equal independence, whose mutual benefit is promoted by intercourse with each other, and by an interchange of those good offices which humanity dictates and its wants require, all sovereigns have consented to a relaxation in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers. * * * A third case in which a sovereign is understood to cede a portion of his territorial jurisdiction is, where he allows the troops of a foreign prince to pass through his dominions. In such case, without any express declaration waiving jurisdiction over the army to which this right of passage has been granted, the sovereign who should attempt to exercise it would certainly be considered as violating his faith. By exercising

it, the purpose for which the free passage was granted would be defeated, and a portion of the military force of a foreign independent nation would be diverted from those national objects and duties to which it was applicable, and would be withdrawn from the control of the sovereign whose power and whose safety might greatly depend on retaining the exclusive command and disposition of this force. The grant of a free passage, therefore, implies a waiver of all jurisdiction over the troops during their passage, and permits the foreign general to use that discipline, and to inflict those punishments which the government of his army may require. * * * When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country."

In Coleman v. Tennessee, 97 U. S. 509, 515, 24 L. Ed. 1118, the court, referring to the case of The Exchange as authority, said:

"It is well settled that a foreign army permitted to march through a friendly country, or to be stationed in it, by permission of its government or sovereign, is exempt from the civil and criminal jurisdiction of the place."

The court quoted with approval the following passage from the opinion of Chief Justice Marshall:

"The grant of a free passage, therefore, implies a waiver of all jurisdiction over the troops during their passage, and permits the foreign general to use that discipline and to inflict those punishments which the government of his army may require."

So in Dow v. Johnson, 100 U. S. 158, 165, 25 L. Ed. 632, the same doctrine is recognized. Wheaton in his Elements of International Law, pt. 2, c. 2, § 9, says:

"A foreign army or fleet, marching through, sailing over, or stationed in the territory of another State, with whom the foreign sovereign to whom they belong is in amity, are also, in like manner, exempt from the civil and criminal jurisdiction of the place."

While the terms "troops" and "army" are used in the above citations, I have no reason to doubt that the rule or law of comity as there enunciated is equally applicable to such a military body as the naval detail in question. It is not disputed that comity is operative in the case of an organized regiment of a friendly foreign power while on our soil by permission of the Executive of the United States, and that proper discipline and obedience may be enforced by those in command without reference to our laws, nor is it disputed that comity is applicable to a marine force as well as to a land force. But the position is taken by the learned presiding judge in his opinion in this case that the rule of comity respects organized bodies only; that Captain Behr and the men under him were not an integral component of the Russian navy, not having become part of the crew of the Variag; that the fact that the men were by Russian law subject to the Captain's control did not of itself make them, when conjointly considered, a constituent unit of the Russian navy; that the question whether Captain Behr's detail should be considered representative of the Russian navy cannot depend merely upon the number composing it; that the true criterion rests upon the distinction be-

tween the concrete parts into which a navy is usually divided and its individual members, the former standing for the navy, while the latter do not; and that Captain Behr and his men were neither marching through this country nor, in the ordinary sense of the word, stationed here. I am unable to assent to the correctness of this line of reasoning or to the conclusion deduced from it. It is, in my judgment, based on too technical and literal an interpretation of the language of the authorities, and falls far short of satisfying the broad policy underlying that language. The men composing the Russian detail in charge of Captain Behr certainly are not included in the category of "private individuals of one nation" who "spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other." While not completely organized as a crew, they nevertheless possessed organization. As before stated, they were in the naval service of Russia and came to our soil in a body under military discipline for the sole purpose of manning a Russian war vessel. They were a portion of the military force of a foreign independent nation at peace with and friendly to the United States. It is wholly unimportant, in my judgment, that they had not actually gone aboard of the Variag as a fully organized crew, or whether they were or were not fully armed and equipped. Nor is it of any moment that they may not technically have been "stationed" on our soil, or were not technically "marching" over it. International comity is not to be frittered away by such refinements. They were here in the employ of their sovereign for strictly national objects and duties. Their organization and the character of their employment clearly brought them within the principles and rules of comity as observed among modern civilized nations, if they were on our soil by the permission or consent of the Executive. Captain Behr and his men arrived in this country October 14, 1899. Ten days before such arrival the acting secretary of the Treasury wrote a letter of which the following is a copy:

No. 19,805.

"Treasury Department,
Office of the Secretary.
Washington D. C.
October 4, 1899.

Sir:—

Acknowledging the receipt of your letter of the 24th ultimo, No. 557, I have the honor to inform you that, in compliance with request contained therein, instructions have been issued to the Commissioner of Immigration at the port of New York, to admit without examination the detail of one officer and fifty-three regular sailors whom you state have been detailed to this country for the purpose of partially manning the cruiser now under construction for the Russian Government at Cramp's Shipyard in Philadelphia, Pennsylvania. The Collector of Customs has also been advised that the usual head tax of $1.00 is not to be collected in this case.

Respectfully yours,
O. L. Spaulding,
Acting Secretary,
T. U. S."

It is evident on the face of the letter that it was intended for and presumably directed to some representative of the Russian government. That he was the Russian ambassador can hardly be questioned. It appears from the record that the counsel for the respond-

107 F.—29

ents below offered the above copy in evidence, stating that the original was 'from the acting Secretary of the Treasury, permitting the landing of the detail, and was, as he understood in the possession of the Russian ambassador at Washington. The offer was objected to by the relator's counsel, but the copy was admitted; whereupon the objection was withdrawn. During the argument of the appeal it was stated positively by the counsel for the appellants that the original was addressed to the Russian ambassador at Washington. This statement in open court, while not expressly acquiesced in by the counsel for the appellee, was not denied, and the argument proceeded, and the case was heard on the assumption that the Russian ambassador was the recipient of the letter. Under the circumstances this court, in my opinion, must treat the above copy as the copy of a letter addressed to and received by the Russian ambassador. Here, then, is a written communication made by the secretary of the Treasury, one of the branches of the executive department of the government, directly to. the immediate representative of Russian sovereignty on our soil. This letter on its face shows several important facts, namely, (1) that it was written in reply to a letter of the Russian ambassador of September 24, 1899; (2) that the instructions issued to the commissioner of immigration to admit the detail without examination, and to the collector of customs not to collect head tax, were "in compliance with request contained therein," that is to say, a request contained in the letter of the Russian ambassador; (3) that the Russian ambassador had stated that the detail of one officer and fifty-three regular sailors had been "detailed to this country for the purpose of partially manning the cruiser now under construction for the Russian government at Cramp's Shipyard in Philadelphia, Pennsylvania"; and (4) that, whatever may have been the reason for not insisting upon examination or collection of head tax, the detail was to be admitted into the United States "in compliance with request" of the Russian ambassador. Assuming for the present that the action of the secretary of the Treasury in thus dealing with the Russian ambassador must be taken as the act of the Executive the Russian government had just cause to expect that its naval detail would be accorded the privileges and immunities incident to the observance of the comity due between independent but friendly nations, without which it might well be questioned whether that government would have allowed the entry of the detail upon, our soil at all. There was a request by Russia through her ambassador, and permission and consent on the part of the executive department of the United States, that the detail should be admitted to our territory for the specific purpose of manning a Russian war vessel. I wholly fail to perceive any force in the suggestion that while the letter of the secretary of the Treasury contemplated a dispensation of the usual examination and of the collection of head tax, it did not contain a permission that the detail should be admitted into the United States. Instructions to admit with or without examination or collection of head tax are still instructions to admit. The contention that consent was not given for the admission of the naval detail qua military force is, in my opinion, equally untenable. The permission contained in the

letter was, not to admit "private individuals of one nation" to "spread themselves through another as business or caprice may direct," but to admit "the detail of one officer and fifty-three regular sailors" who had been "detailed to this country for the purpose of partially manning the cruiser now under construction for the Russian Government at Cramp's Shipyard in Philadelphia, Pennsylvania." Here is an express consent to the admission upon our soil of a military force qua military force, and in no other character or capacity. It was a naval detail under the command of a naval officer, and the sole purpose of its admission appears on the face of the letter to have been purely military, namely, the manning of a Russian war vessel. The contention under discussion seems to involve the assumption that as a prerequisite to the operation of comity the permission granted to a military force of a friendly foreign power to enter or remain upon our soil qua military force, must be coupled with an enumeration of the privileges and immunities to be accorded to such force while here. But such an assumption is unfounded. While such a specification or enumeration may properly be the subject of convention between sovereign powers, it is well settled that, in the absence of such convention, the admission upon our soil of a military force qua military force carries with it by implication the same right on the part of the commander to enforce discipline and compel obedience as exists in the country to which it belongs, in so far as its exercise is not prejudicial to us. And this right continues until terminated by an act of sovereignty on the part of the United States. In the case of The Exchange, supra, Chief Justice Marshall, speaking of the passage through a sovereign's dominions of the troops of a foreign prince by the allowance or permission of the former, said:

"In such case, without any express declaration waiving jurisdiction over the army to which this right of passage has been granted, the sovereign who should attempt to exercise it would certainly be considered as violating his faith. * * * The grant of a free passage, therefore, implies a waiver of all jurisdiction over the troops during their passage, and permits the foreign general to use that discipline, and to inflict those punishments which the government of his army may require."

The consent given by the executive department to the entry of the Russian detail for the purpose of manning the Variag by necessary implication involved consent that the detail should in that character remain on our soil, and have a "right of passage" over our soil, for that purpose. Good faith between friendly nations as well as the obvious sense of the communication repudiates any other interpretation. The idea that the consent given was restricted to the mere admission of the detail upon our soil, and that it was intended that immediately thereafter that body should lose its cohesive power and discipline as part of the military force of Russia, is inadmissible. If the consent given by the Treasury department is to be taken as the act of the Executive, international comity requires the recognition of a right on the part of Captain Behr as commander of the detail to exercise military discipline, which, of course, includes the usual and indispensable power, possessed by commanders of military forces, to arrest and have custody of a deserter. The Executive

speaks and acts through the heads of the several departments in relation to subjects pertaining to their respective duties, and their action with respect to such subjects is presumed to have been taken with the approval and by direction of the Executive. Wilcox v. Jackson, 13 Pet. 498, 513, 10 L. Ed. 264; U. S. v. Eliason, 16 Pet. 291, 302, 10 L. Ed. 968; The Confiscation Cases, 20 Wall. 92, 109, 22 L. Ed. 320; U. S. v. Farden, 99 U. S. 10, 19, 25 L. Ed. 267; Wolsey v. Chapman, 101 U. S. 755, 769, 25 L. Ed. 915; Runkle v. U. S., 122 U. S. 543, 557, 7 Sup. Ct. 1141, 30 L. Ed. 1167. The State department is the executive branch of the government which is charged with our foreign relations, and the secretary of State as the head of that department is the usual channel of communication with foreign powers. But I am not aware that either he or that department is the only channel through which such communication can be made. Certainly the Executive has power to communicate with a foreign ambassador through the Treasury department touching matters in which the foreign sovereign is interested which are within the scope of the functions of that department. And if the secretary of the Treasury deal with a foreign ambassador touching such matters, it must be presumed, in the absence of evidence to the contrary, that such dealing is had by direction and with the approval of the Executive. Especially is this true where without such authorization, general or specific, the action of that department would involve a breach of law. It is unreasonable that the exercise of comity should be made to depend in a case like this upon such formalities as would naturally and properly attend the granting of permission by the government of the United States to a fully organized and equipped foreign army to traverse our territory. The law regards substance rather than form. The comity which should be observed between the United States and Russia as friendly nations at peace with each other should not be brushed aside on account of the absence of formalities, which in this case would have been unessential and uncalled for, if not out of place. Russia contracted with an American company for the building on American soil of a war vessel for the Russian government, and sent Captain Behr and his men to form part of her crew. At the request of the Russian ambassador the detail was admitted without examination or payment of head tax. Both of these matters were properly within the cognizance of the Treasury department, and the action of the secretary of the Treasury in so admitting the detail should be taken as the act of the Executive. But if it be assumed that the secretary of the Treasury was without authority to admit the Russian detail to our soil as a military force, and further, that the letter of October 4, 1899, was not addressed to or received by the Russian ambassador, how would the case stand? I cannot perceive any difference in principle, so far as the obligation to observe comity toward a friendly foreign nation is concerned, between a case where a portion of its military force has entered the United States with the permission of the Executive, and a case where a portion of the military force of such foreign nation, having entered the United States without the permission of the Executive, subsequently remains on our soil with such

permission. In either case the same line of reasoning is applicable. Chief Justice Marshall, in The Exchange, supra, said:

"We have seen that a license to pass through a territory implies immunities not expressed, and it is material to inquire why the license itself may not be presumed? It is obvious that the passage of an army through a foreign territory will probably be at all times inconvenient and injurious, and would often be imminently dangerous to the sovereign through whose dominion it passed. Such a practice would break down some of the most decisive distinctions between peace and war, and would reduce a nation to the necessity of resisting by war, an act not absolutely hostile in its character, or of exposing itself to the stratagems and frauds of a power whose integrity might be doubted, and who might enter the country under deceitful pretexts. It is for reasons like these that the general license to foreigners to enter the dominions of a friendly power is never understood to extend to a military force; and an army marching into the dominions of another sovereign, may justly be considered as committing an act of hostility; and, if not opposed by force, acquires no privilege by its irregular and improper conduct. It may, however, well be questioned whether any other than the sovereign power of the State be capable of deciding that such military commander is without a license."

It may seriously be doubted whether a detail of the Russian navy consisting of an officer and fifty-three subordinates, peaceably entering this country for the purpose of manning a Russian war vessel constructed on our soil by an American company under a contract with the Russian government, can justly be considered on the same footing as "an army marching into the dominions of another sovereign," in the sense in which those words were employed in the above quoted clause. If, however, it be conceded that such detail, should be so considered, there is no evidence whatsoever that the Executive, or any other branch of government of the United States, has decided that such detail entered this country or has remained, here without proper license or permission. Wholly aside from the correspondence with the Russian ambassador, the record shows the military character of the detail and the purpose for which it came, to and remained on our soil, and the United States has not in any, manner questioned the authority and right of that detail to continue here in that character for the accomplishment of the purpose for which it came. On the contrary the government has clearly recognized such right and authority. By leave of this court the United States attorney for the eastern district of Pennsylvania at the hearing filed the following suggestion:

"The Keeper of the Philadelphia County Prison and Captain Vladimir Behr, Master of the Russian Cruiser Variag,

Appellants,

The United States of America ex rel. Leo Alexandroff,

Appellee.

United States Circuit Court of Appeals, Third Circuit.
September Term, 1900.

And now, to wit, this First day of October, A. D. 1900, comes James B. Holland, Esquire, United States Attorney for the Eastern District of Pennsylvania, at the instance of the Executive Department of the Government of the United States, and files of record a suggestion as follows:

Inasmuch as it appears by the record in the above entitled cause, that Leo Alexandroff, the relator, is a subject and citizen of the Empire of Russia and

enrolled in the naval service of his country as an assistant physician; that he came to the United States, together with fifty-two other men, under the charge of an officer of the Russian Imperial Marine, detailed for the purpose of manning the Cruiser Variag, a vessel under construction for the Russian Government by the William Cramp Ship and Engine Building Company of Philadelphia; that prior to the arrival of the said officer and men and in pursuance of correspondence with the Russian Ambassador, instructions were issued by the Secretary of the Treasury at Washington to the Commissioner of Immigration at New York, admitting the said officer and his subordinates for the purpose of partially manning the Cruiser, and inasmuch as the said Leo Alexandroff remained in the Russian Naval Service after his arrival in the United States until April 20th, 1900, when he deserted, lived a week in Philadelphia and then went to New York, where he was apprehended by Captain Vladimir Behr, Master of the Variag, brought to Philadelphia and confined in the County Prison for safe keeping, and inasmuch as his period of enlistment in the Russian Imperial service was for six years from 1896, and, in pursuance of said enlistment, he left Russia for America, knowing he was to become one of the crew of the newly constructed cruiser and for that purpose alone and upon his arrival here and until he deserted, lived with the other members of his company, was supported by the Russian Government, and received wages for his services as a member of her crew, and inasmuch as it further appears by the record in the above entitled cause, that the said cruiser Variag was built under written contract between the Russian Government and the Cramp company, which provided among other things, as reference to the said record will more fully and at large appear, that the said vessel and all materials entering into her or intended for her construction should become and be the exclusive property of the Russian Ministry of Marine, and inasmuch, further, as there exists · between the United States of America and his Majesty, the Emperor of Russia, a state of peace and amity, and inasmuch as it does not appear but that the said officer having in charge the relator and the other sailors he brought to this country has conformed in all things to the law of nations and the laws of the United States and his authority over and custody and control of the said relator should not be interfered with directly or indirectly by the Government of the United States or by any of the courts created in pursuance thereof, it is

Respectfully Suggested

To the Honorable, the Judges of the Circuit Court of Appeals, for the Third Circuit, that Leo Alexandroff, the relator, should be remanded to the custody of the keeper of the County Prison at Philadelphia, to await the orders of Captain Vladimir Behr, the Master of said Cruiser Variag.

James B. Holland,<br>United States Attorney."

This suggestion, made by executive authority, while informal in some respects, not only is a direct recognition and ratification by the Executive of the action of the secretary of the Treasury in admitting Captain Behr and his command to our soil, but discloses in an unmistakable manner that the attitude of the government toward that detail is and has been one of international comity. It is not susceptible of any other construction. Further than this, it is a request by the Executive, addressed to this court, that the relator, who is now within its control, be remanded to the custody of the keeper of the prison to await the orders of Captain Behr, on the ground that, in view of the existence of a state of peace and amity between the United States and Russia, Captain Behr's "authority over and control of the said relator should not be interfered with directly or indirectly by the government of the United States or by any of the courts." I do not deem it of any moment that the suggestion refers to facts as appearing by the record instead of in-

dependently averring such facts. This at most could constitute only a formal defect. If the record discloses facts sufficient to warrant the observance by the Executive of comity toward Russia with respect to Captain Behr and his command it is all that was necessary. Facts appearing by the record are quite as potent as facts independently asserted in a suggestion, if reference be made to the record as disclosing them. That the facts referred to in the suggestion and which appear by the record are sufficient I have no reason to doubt. The attitude of the executive department toward the Russian detail must be regarded as the result of an executive decision, political in its character, which should be respected by all courts. To hold that Captain Behr has no right to the custody of the relator as a deserter from the military force under his command is, in my judgment, not only to ignore the obligations of international comity, but to thwart the executive will as declared to this court in a matter properly of executive determination. Captain Behr having, as matter of military discipline, the right summarily to arrest and confine the relator as a deserter, misconceived his remedy, erroneously supposing that the facts brought the case within the provisions of Article IX of the treaty of December, 1832, between the United States and Russia. But, although the commitment of the relator to prison in the proceedings taken was not justified by the facts, the court below was not, nor is this court, obliged to discharge him. By virtue of section 761 of the revised statutes the court has authority to dispose of him "as law and justice require."

In Nishimura Ekiu v. U. S., 142 U. S. 651, 662, 12 Sup. Ct. 336, 35 L. Ed. 1146, Mr. Justice Gray in delivering the opinion of the court said:

"A writ of habeas corpus is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and if sufficient ground for his detention by the government is shown, he is not to be discharged for defects in the original arrest or commitment."

The intent of section 761 is that the party seeking a discharge through habeas corpus proceedings should be disposed of as law and justice at the time of such disposition shall require. Iasigi v. Van de Carr, 166 U. S. 391, 17 Sup. Ct. 595, 41 L. Ed. 1045. I cannot assent to the proposition advanced in the opinion of the learned presiding judge that the question here presented relates to the right of an officer of a foreign navy to require the assistance of the courts of this country for the recapture of a deserter. Captain Behr is not the actor in this case. On the contrary the relator has proceeded against Captain Behr and the keeper of the county prison. The former was committed by a United States Commissioner to the custody of the keeper of the prison, to be held subject to the order of the Russian vice-consul at Philadelphia or of Captain Behr, master of the Variag. The relator in his petition for a writ of habeas corpus prayed that the writ might be directed to the keeper of the prison and to Captain Behr, and the writ was so directed. Although the commitment was illegal, the relator was in fact held by the keeper of the prison subject to the order of Captain Behr, and it was

in the power of the latter at any time before the filing of the petition for the writ of habeas corpus to take bodily possession of the relator. While the keeper of the prison may not legally have been the agent of Captain Behr, yet his possession of the relator was potentially a possession by Captain Behr, and the writ of habeas corpus had for its object the termination of the actual control possessed by Captain Behr over the relator. Having reached the conclusion that Captain Behr, by the law of comity, has from the time of the relator's desertion been and now is justly entitled to the possession of the relator's person, I am of the opinion that the judgment of the court below should be reversed, with directions to remand the relator to the custody of the keeper of the prison, to be by him delivered to Captain Behr or, on his order, to the Russian vice-consul at Philadelphia.